# LEVITT, COMPTROLLER OF NEW YORK, ET AL. v. COMMITTEE FOR PUBLIC EDUCATION & RELIGIOUS LIBERTY ET AL.

No. 72–269.   Argued March 19, 1973—Decided June 25, 1973*

---

*Together with No. 72–270, *Anderson* v. *Committee for Public Education & Religious Liberty et al.*, and No. 72–271, *Cathedral Academy et al.* v. *Committee for Public Education & Religious Liberty et al.*, also on appeal from the same court.

BURGER, C. J., delivered the opinion of the Court, in which STEW-ART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, BRENNAN, and MARSHALL, JJ., filed a separate statement, *post*, p. 482. WHITE, J., dissented.

*Jean M. Coon,* Assistant Solicitor General of New York, argued the cause for appellants in Nos. 72–269 and 72–270. With her on the brief for appellants in No. 72–269 were *Louis J. Lefkowitz,* Attorney General, and *Ruth Kessler Toch,* Solicitor General. *John F. Haggerty* and *Louis P. Contiguglia* were on the briefs for appellant in No. 72–270. *Porter R. Chandler* argued the cause for appellants in No. 72–271. With him on the briefs was *Richard E. Nolan. Nathan Lewin* and *Julius Berman* were on the brief for appellants Bais Yaakov Academy for Girls et al. in No. 72–271.

*Leo Pfeffer* argued the cause and filed a brief for appellees.†

---

†*Ethan A. Hitchcock* filed a brief for New York State Association of Independent Schools as *amicus curiae* urging reversal.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We are asked to decide whether Chapter 138 of New York State's Laws of 1970, under which the State reimburses private schools throughout the State for certain costs of testing and recordkeeping, violates the Establishment Clause of the First Amendment. A three-judge District Court, with one judge dissenting, held the Act unconstitutional. 342 F. Supp. 439 (SDNY 1972). We noted probable jurisdiction. 409 U. S. 977.

I

In April 1970, the New York Legislature appropriated $28,000,000 for the purpose of reimbursing nonpublic schools throughout the State

> "for expenses of services for examination and inspection in connection with administration, grading and the compiling and reporting of the results of tests and examinations, maintenance of records of pupil enrollment and reporting thereon, maintenance of pupil health records, recording of personnel qualifications and characteristics and the preparation and submission to the state of various other reports as provided for or required by law or regulation."[1] New York Laws 1970, c. 138, § 2.

As indicated by the portion of the statute quoted above, the State has in essence sought to reimburse private schools for performing various "services" which the State "mandates." Of these mandated services, by far the most expensive for nonpublic schools is the "administration, grading and the compiling and reporting of the

---

[1] N. Y. Educ. Law § 305 charges the Commissioner of Education with the duty of maintaining general supervision over all schools throughout the State and with making sure that each school is "examined and inspected."

results of tests and examinations." Such "tests and examinations" appear to be of two kinds: (a) state-prepared examinations, such as the "Regents examinations" and the "Pupil Evaluation Program Tests," [2] and (b) traditional teacher-prepared tests, which are drafted by the nonpublic school teachers for the purpose of measuring the pupils' progress in subjects required to be taught under state law.[3] The overwhelming majority

---

[2] The Regents' examinations are described by appellants Levitt and Nyquist as "state-wide tests of subject matter achievement." The pupil evaluation program tests, the so-called "PEP Tests," are also administered throughout the State in grades three, six, and nine.

[3] The District Court indicated that there was some doubt as to whether teacher-prepared tests are within the scope of the Act. The uncertainty was due to one of appellant Nyquist's answers to appellees' interrogatories, which stated that "only the Regents Scholarship and January and June Regents Examinations might be regarded as *specifically mandated.*" 342 F. Supp. 439, 441 (emphasis in original interrogatory). The District Court, however, found it unnecessary to resolve this factual ambiguity, stating: "While our decision as to the constitutionality of the statute does not turn on the factual question so presented, we mention it to illustrate the lack of certainty as to the purposes for which the moneys received are actually used, or, indeed, whether they can be regarded as specifically 'mandated.'" *Ibid.*

In this Court, appellants have insisted that since teacher-prepared examinations are required by state regulation they are included within the services reimbursed under the Act. In support of the former proposition, the appellants cite § 176.1 (b) of the Regulations of the Commissioner of Education, which provides that all nonpublic schools "shall conduct in all grades in which instruction is offered a continuing program of individual pupil testing designed to provide an adequate basis for evaluating pupil achievement, and in addition shall administer, rate and report the results of all specific tests or examinations which may be prescribed by the commissioner." 8 N. Y. C. R. R. § 176.1 (b).

Appellees do not contest the validity of appellants' construction of the Act, and we accept it for the purposes of this litigation.

of testing in nonpublic, as well as public, schools is of the latter variety.

Church-sponsored as well as secular nonpublic schools are eligible to receive payments under the Act. The District Court made findings that the Commissioner of Education had "construed and applied" the Act "to include as permissible beneficiaries schools which (a)· impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doctrine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach." 342 F. Supp., at 440–441.

A school seeking aid under the Act is required to submit an application to the Commissioner of Education, who may direct the applicant to file "such additional reports" as he deems necessary to make a determination of eligibility. New York Laws 1970, c. 138, § 4. Qualifying schools receive an annual payment of $27 for each pupil in average daily attendance in grades one through six and $45 for each pupil in average daily attendance in grades seven through 12.[4] Payments are made in

---

[4] Exactly how the $27 and $45 figures were arrived at is somewhat unclear. Appellant Nyquist, in his answer to appellees' interrogatories in the court below, gave the following explanation:

"That prior to the enactment of Chapter 138 of the Laws of 1970, a conference was held in which representatives of the Office of the Counsel to the Governor, of the Division of the Budget in the Executive Department and of the State Education Department participated; that at said conference the representatives of the State Education Department were asked whether the dollar amount in

two installments: Between January 15 and March 15 of the school year, one-half of the "estimated total apportionment" is paid directly to the school; the balance is paid between April 15 and June 15. The Commissioner is empowered to make "later payments for the purpose of adjusting and correcting apportionments." *Id.*, § 5.

Section 8 of the Act states: "Nothing contained in this act shall be construed to authorize the making of any payment under this act for religious worship or instruction." However, the Act contains no provision authorizing state audits of school financial records to determine whether a school's actual costs in complying with the mandated services are less than the annual lump sum payment. Nor does the Act require a school to return to the State moneys received in excess of its actual expenses.[5] In appellant Nyquist's answers to appellees' interrogatories, which the parties stipulated could be "taken as accepted facts for the purposes of this case," the Commissioner stated that "qualifying schools are not

question was reasonable and that the answer was that to the best of their judgment the amount was reasonable; that no record of the said conference was made."

[5] Subsequent to the enactment of Chapter 138, the state conducted several studies to determine whether the per-pupil allotment under the statute exceeded the actual costs to schools in performing the mandated services. The District Court found the results "cloudy":

"If such items as 'teacher examinations' and 'entrance examinations' are included in the list of 'mandated services,' it appears that the schools' expenses are at least as great as the amounts they receive from the state. But if those items are excluded, the amounts received from the state are substantially greater than the schools' expenses." 342 F. Supp., at 441.

As noted above, the court did not resolve the question whether payments under the Act were intended to compensate schools for internal testing. See n. 3, *supra*.

required to submit reports accounting for the moneys received and how they are expended."

## II

Appellees are New York taxpayers and an unincorporated association. They filed this suit in the United States District Court claiming that Chapter 138 abridges the Establishment Clause of the First Amendment. An injunction was sought enjoining appellants Levitt and Nyquist, the State Comptroller and Commissioner of Education respectively, from enforcing the Act. State Senator Earl W. Brydges and certain Catholic and Jewish parochial schools qualified to receive aid under the Act were permitted to intervene as parties defendant.

A three-judge District Court was convened pursuant to 28 U. S. C. §§ 2281, 2284. After a hearing on the merits, a majority of the District Court permanently enjoined appellants from enforcement of the Act. The District Court concluded that this case was controlled by our decision in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), and held the Act unconstitutional under the Establishment Clause.

In reaching its decision, the District Court rejected appellants' argument that the Act is constitutional because payments are made only for services that are "secular, neutral, or nonideological" in character. *Id.,* at 616. The court stated:

> "By far the greatest portion of the funds appropriated under Chapter 138 is paid for the services of teachers in testing students, and testing is an integral part of the teaching process." 342 F. Supp., at 444.

Likewise, the court dismissed as "fanciful" the contention that a State may reimburse church-related schools for costs incurred in performing any service "mandated" by state law.

## III

In *Committee for Public Education & Religious Liberty* v. *Nyquist, post,* p. 756, the Court has today struck down a provision of New York law authorizing "direct money grants from the State to 'qualifying' non-public schools to be used for the 'maintenance and repair of . . . school facilities and equipment to ensure the health, welfare and safety of enrolled pupils.' " *Id.,* at 762 (footnote omitted).[6] The infirmity of the statute in *Nyquist* lay in its undifferentiated treatment of the maintenance and repair of facilities devoted to religious and secular functions of recipient, sectarian schools. Since "[n]o attempt is made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes," the Court held that the statute has the primary effect of advancing religion and is, therefore, violative of the Establishment Clause. *Id.,* at 774.

The statute now before us, as written and as applied by the Commissioner of Education, contains some of the same constitutional flaws that led the Court to its decision in *Nyquist.*[7] As noted previously, Chapter 138

---

[6] The Court's holding as to grants of public funds for "maintenance and repair of . . . school facilities and equipment . . ." is sufficient authority to support affirmance of the District Court holding in this case. The author of this opinion joined that part of the Court's holding in *Nyquist, supra,* while dissenting from the holding that tuition grants and tax credits to parents are unconstitutional, and is, of course, bound by all parts of the judgment.

[7] We do not doubt that the New York Legislature had a "secular legislative purpose" in enacting Chapter 138. See *Epperson* v. *Arkansas,* 393 U. S. 97 (1968). The first section of the Act provides that the State has a "primary responsibility" to assure that its youth receive an adequate education; that the State has the "duty and authority" to examine and inspect all schools within its borders to make sure that adequate educational opportunities are being pro-

provides for a direct money grant to sectarian schools for performance of various "services." Among those services is the maintenance of a regular program of traditional internal testing designed to measure pupil achievement. Yet, despite the obviously integral role of such testing in the total teaching process, no attempt is made under the statute, and no means are available, to assure that internally prepared tests are free of religious instruction.

We cannot ignore the substantial risk that these examinations, prepared by teachers under the authority of religious institutions, will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church. We do not "assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment." *Lemon* v. *Kurtzman,* 403 U. S., at 618. But the potential for conflict "inheres in the situation," and because of that the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination. See *id.,* at 617, 619. Since the State has failed to do so here, we are left with no choice under *Nyquist* but to hold that Chapter 138 constitutes an impermissible aid to religion; this is so because the aid that will be devoted to secular functions is not identifiable and separable from aid to sectarian activities.

In the District Court and in this Court appellants insisted that payments under Chapter 138 do not aid the religious mission of church-related schools but merely provide partial reimbursement for totally nonsectarian activities performed at the behest of the State. Ap-

---

vided; and that the State has a legitimate interest in assisting those schools insofar as they aid the State in fulfilling its responsibility.

pellants, in other words, contend that this case is controlled by our decisions in *Everson* v. *Board of Education,* 330 U. S. 1 (1947), and *Board of Education* v. *Allen,* 392 U. S. 236 (1968). In *Everson* we held that New Jersey could reimburse parents of parochial school children for expenses incurred in transporting the children on buses to their schools. And in *Allen* we upheld a New York statute requiring local school boards to lend secular textbooks "to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law." *Id.,* at 239.

In this case, however, we are faced with state-supported activities of a substantially different character from bus rides or state-provided textbooks. Routine teacher-prepared tests, as noted by the District Court, are "an integral part of the teaching process." 342 F. Supp., at 444. And, "[i]n terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not." *Lemon* v. *Kurtzman,* 403 U. S., at 617.

To the extent that appellants argue that the State should be permitted to pay for any activity "mandated" by state law or regulation, we must reject the contention. State or local law might, for example, "mandate" minimum lighting or sanitary facilities for all school buildings, but such commands would not authorize a State to provide support for those facilities in church-sponsored schools. The essential inquiry in each case, as expressed in our prior decisions, is whether the challenged state aid has the primary purpose or effect of advancing religion or religious education or whether it leads to excessive entanglement by the State in the affairs of the religious institution. *Committee for Public Education & Re-*

*ligious Liberty* v. *Nyquist, supra,* at 772–773; *Kurtzman, supra,* at 612–613. That inquiry would be irreversibly frustrated if the Establishment Clause were read as permitting a State to pay for whatever it requires a private school to do.

We hold that the lump-sum payments under Chapter 138 violate the Establishment Clause. Since Chapter 138 provides only for a single per-pupil allotment for a variety of specified services, some secular and some potentially religious, neither this Court nor the District Court can properly reduce that allotment to an amount corresponding to the actual costs incurred in performing reimbursable secular services. That is a legislative, not a judicial, function.

Accordingly, the judgment of the District Court is affirmed.

MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL are of the view that affirmance is compelled by our decision today in *Committee for Public Education & Religious Liberty* v. *Nyquist, post,* p. 756, and *Sloan* v. *Lemon, post,* p. 825.

MR. JUSTICE WHITE dissents.