CATHEDRAL ACADEMY, Appellant, v STATE OF NEW YORK, Respondent. (Claim No. 56557.)

Third Department, April 24, 1975

*Davis, Polk & Wardwell (Richard E. Nolan, Thomas J. Aquilino, Jr.,* and *Lowell Gordon Harris* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (Jean M. Coon, Ruth Kessler Toch* and *Kenneth J. Connolly* of counsel), for respondent.

GREENBLOTT, J. By chapter 138 of the Laws of 1970, the New York State Legislature enacted the Mandated Services Act which provided that for school years beginning after July 1, 1970 qualifying nonpublic elementary and secondary schools would be reimbursed for the expenses incurred in providing various testing, record-keeping and related services which were required to be performed by separate statutory provision. The payments were not contingent upon performance of the services since said services were independently required. Reimbursement was to be in the form of two equal installments, the first payable up to March 15, the balance payable between April 15 and June 15. No requirement that recipient schools account for actual costs incurred was imposed; rather, payments were to be determined pursuant to a statutory formula whereby each school was to receive for each pupil in average daily attendance $27 in grades 1 through 6 and $45 in grades 7 through 12. These amounts were determined because in the judgment of representatives of the State Education Department, they were "reasonable" *(Levitt v Committee for Public Educ.,* 413 US 472, 476, n 4).

In July, 1970 an action was commenced in United States

District Court for the Southern District of New York, seeking to have the Mandated Services Act declared unconstitutional as violative of the religion clauses of the First Amendment to the Federal Constitution. It was not until April 27, 1972 that a three-Judge court by a divided vote declared the act unconstitutional, and on June 1, 1972 a final judgment was entered permanently enjoining reimbursement to nonpublic schools *(Committee for Public Educ. & Religious Liberty v Levitt,* 342 F Supp 439). In the interim, the 1970–71 school year and most of the 1971–72 school year had been completed, and since the complainants had not sought temporary injunctive relief, appellant, a nonpublic school operated under the auspices of the Roman Catholic Church, Albany Diocese, as well as numerous other nonpublic schools, was actually reimbursed for the 1970-71 school year and for the first half of the 1971–72 school year. An appeal was taken to the United States Supreme Court which on June 25, 1973, by a vote of 8 to 1, affirmed the judgment of the District Court *(Levitt v Committee for Public Educ.,* 413 US 472 [hereinafter, *"Levitt"]).* In so doing, the court referred to its decision in *Lemon v Kurtzman* (403 US 602 *[Lemon I]),* and in noting the "potential for conflict" inherent in State payments to religious schools, held that because the State had failed to take any steps to assure that "state-supported activity is not being used for religious indoctrination * * * Chapter 138 constitutes an impermissible aid to religion; this is so because the aid that will.be devoted to secular functions is not identifiable and separable from aid to sectarian activities" *(Levitt, supra,* p 480).[1]

Subsequent to the District Court judgment, the New York State Legislature apparently took the view that nonpublic schools such as claimant had been placed in inequitable situations because they had already performed the services but could no longer be paid therefor under the invalidated Mandated Services Act. Accordingly, the Legislature enacted chapter 996 of the Laws of 1972 which, in essence, conferred

---

1. This is not to say that the State could necessarily provide such assurance in a manner which would survive constitutional scrutiny. In *Lemon I,* the basis for invalidating Pennsylvania's and Rhode Island's aid programs was, briefly, the extensive process of audit, inspection and oversight required by the State to provide the necessary assurances, thus fostering an "excessive entanglement" between church and State. We shall refer to this problem later.

For a further explanation of the reasons underlying the court's determination that the payments were in danger of being applied for religious purposes, the opinion of the court, and of the Court of Claims in the present case, should be examined.

jurisdiction on the Court of Claims to "hear, audit and determine" claims of eligible nonpublic schools for reimbursement of funds expended in the performance of services which had been required by law.[2] This appeal is from a decision of the Court of Claims dismissing the claim on the ground that chapter 996 violates the Establishment Clause of the First Amendment. (It appears to be assumed by the parties that chapter 996 is intended to be limited in its application to reimbursing the schools solely for the second semester of the 1971–72 school year.) Appellant urges that equitable considerations, primarily the good faith reliance by appellant and other schools in fashioning their budgets in expectation of payment warranted remedial legislative intervention, and that precedent for upholding the validity of one-time payments can be found in *the decision* in *Lemon v Kurtzman* (411 US 192 *[Lemon II]*).

In *Lemon I,* the case was remanded to the District Court to fashion a decree, whereupon the latter court enjoined payments under the Pennsylvania statute (Pa. Stat. Ann., tit. 24, §§ 5601–5609) but permitted the State to reimburse nonpublic sectarian schools for services provided before the Supreme Court decision. (There, as here, no temporary injunctive relief had been sought.) Under the Pennsylvania statute there in question, nonpublic schools were to be reimbursed for certain education services pursuant to contracts with the State. The services consisted of furnishing teachers, texts and instructional materials in certain "secular" courses. In addition to compensating the schools, the State was to "undertake continuing surveillance of the instructional programs to insure that the services purchased were not provided in connection with 'any subject matter expressing religious teaching' " *(Lemon II, supra,* 411 US, at p 195). The statute further required the schools to maintain separate funds and accounts pertaining to the services provided, which accounts were to be subject to audit by State officials.

In striking down the Pennsylvania statute in *Lemon I,* the court focused upon the fact that the requirement of on-going scrutiny as above-described fostered an "excessive entanglement" between church schools and State. The validity of the payments themselves, on the facts there presented, was not determined—that issue did not arise until the question of

2. No claim is made that appellant and other nonpublic schools should be required to refund payments which have already been made.

reimbursement was raised in *Lemon II* (see 411 US, at p 202). In allowing those payments to be made, the Supreme Court stated that reliance interests had significant weight in the shaping of an equitable remedy. However, those reliance interests were weighed not in a vacuum, but, rather, in the context of "the remote possibility of constitutional harm" *(Lemon II, supra,* p 203). That remoteness was founded upon the fact that entanglements in the nature of inspection, audit, and the like had already occurred, wherefore "payment * * * will compel no further state oversight of the instructional processes". Moreover, and perhaps more significant to a consideration of the case at bar, "that very process of oversight— now an accomplished fact—assures that state funds will not be applied for any sectarian purposes." *(Lemon II, supra,* pp 202–203.) In reaching this conclusion, the court took notice of the existence of an "insoluble paradox" inherent in the fact that payments to religious schools could not be made without some assurance that they would be applied only to secular purposes, yet such assurances could not be provided without engaging in the forms of oversight constituting entanglements of a sort prohibited by *Lemon I.* In *Lemon II,* the "insoluble paradox" was "avoided because the entangling supervision prerequisite to state aid has already been accomplished and need not enter into [an] evaluation" of the payments to be made *(Lemon II, supra,* 411 US, at p 203, n 3). In the case at bar, on the other hand, the paradox is squarely presented.

We are of the view that the paradox cannot be resolved without sanctioning a violation of the religion clauses of the First Amendment, and therefore we affirm. The factor of greatest significance in leading us to this result is that in *Levitt,* the payments themselves were held to be unconstitutional because of the inability to identify secular purposes to which they would be applied. Nor has any relationship been shown between the payment formula and such supposed secular purposes; as the court noted, "exactly how the $27 and $45 figures were arrived at is somewhat unclear." *(Levitt, supra,* 413 US, at p 476, n 4.) For all its well-argued efforts to bring this case within the ambit of *Lemon II,* appellant has failed to demonstrate how payments under chapter 996 of the Laws of 1972 would differ in substance or form, in quality or quantity, from prohibited payments under the invalidated Mandated Services Act.[3] Thus, if payments are to be made under chapter

---

3. In addition to the distinction based on the fact that the decision in *Lemon I* did

996 pursuant to the same formula as had been in effect under the Mandated Services Act, a finding that such payments would be unconstitutional because not limited to identifiable secular purposes is inescapable. If, on the other hand, chapter 996 contemplates that appellant and other schools are to be reimbursed only for actual costs incurred in performing the mandated services, some process of audit, inspection and supervision, invalid under the standards set up in *Lemon I,* would now be required.[4] Because of this fundamental distinction—the lack of an already-completed "entangling" process—the constitutional interests at stake in the present case are weightier than those in *Lemon II,* and cannot be overcome by appellant's reliance arguments.

Appellant argues, however, that those constitutional interests, just as the interests in *Lemon II,* will be "implicated only once under special circumstances that will not recur" *(Lemon, II,* 411 US, at p 202). In *Lemon II,* however, a constitutional interest arising from the payments was assumed for the purpose of discussion, since the constitutionality of the statute in *Lemon I* had not turned upon the invalidity of the payments per se, whereas in the present case, the constitutional interest is more tangible because of the invalidation of the payments under *Levitt.* Moreover, in this case, a further constitutional interest will be implicated because of the need for State oversight in the form, at the very least, of an audit process.

We agree with the following remarks of the learned Judge in the Court of Claims: "Sympathize as we do with this claimant, and the many others similarly situated, and recognize as we must their great and ongoing contributions to the

---

not invalidate the payments per se under the Pennsylvania statute, it is also noteworthy that the Federal court there undertook to fashion an equitable remedy by carving out an exception to the scope of the injunction. Here, the Federal court has not seen fit to do so; the injunction against payments stands, without limitation.

4. Presiding Justice HERLIHY, arguing in his dissent that reimbursement should be permitted because of the reliance by the schools upon the expectation of payment, is of the view that reimbursement should be in such amount as would be determined by the trial court to equal the expenditures incurred in performing the services. This amount, as previously suggested, may be markedly different from the amount which appellant and others might have expected under the Mandated Services Act formula. We are unable to agree with the contention that because appellant and others similarly situated relied upon being paid in an amount determined according to that formula, they should be entitled to reimbursement in an amount which bears no demonstrated relationship to the payments which would have been forthcoming under that formula.

education of over 800,000 young people in this State, and aware as we are of the serious financial problems directly facing the parochial schools, and indirectly, the public, we are, nevertheless, at the same time, constrained because of the Supreme Court decisions in *Levitt* and *Lemon II,* to deny reimbursement as being unconstitutional." *(Cathedral Academy v State of New York,* 77 Misc 2d 977, 985.)

The judgment should be affirmed, without costs.

HERLIHY, P. J. (dissenting). The Court of Claims dismissed the claim of Cathedral Academy solely on the ground that chapter 996 was violative of the Establishment Clause of the First Amendment and was, therefore, void. It is from that decision that this appeal has been brought.

The appellant contends that the Court of Claims misapprehended both the purpose and effect of chapter 996 and that rather it provides a constitutionally valid means to reimburse qualifying nonpublic schools for the second semester of the 1971–1972 academic year.

The majority opinion amply sets forth the background of this proceeding and I agree with its conclusion that the basis for the finding of unconstitutionality in regard to the Mandated Services Act in *Levitt v Committee for Public Educ.* (413 US 472) (hereinafter referred to as *Levitt)* was different from the finding in the case of *Lemon v Kurtzman* (403 US 602 *[Lemon I]).* Nevertheless, the conclusion of the majority that the difference in the particular reason which required a declaration that the legislative enactment was unconstitutional would result in the one-time payment provided for in chapter 996 of the Laws of 1972 being different in nature or quality from that permitted in *Lemon v Kurtzman* (411 US 192 *[Lemon II])* is not well founded.

Pursuant to chapter 996 of the Laws of 1972, there is to be a postaudit to determine whether or not the mandated services had in fact been performed by the claimant.* While it is true that in *Lemon II* there had presumably been active supervision of the affairs of the school so as to insure that the acts for which reimbursement was to be made were not at

---

* The statute conferred jurisdiction on the Court of Claims to "hear, audit and determine" claims of eligible nonpublic schools. In *Levitt* there apparently was a tacit understanding that $27 per pupil would be paid for grades 1 through 6 and $45 per pupil for grades 1 through 12.

least directly for religious purposes, the postaudit, which in this case is to be performed by the Court of Claims, will necessarily establish whether or not the amounts claimed for mandated services constitute a furtherance of the religious purposes of the claimant. To be sure, there will be an indirect furtherance of the religious purposes of the claimant Academy insofar as the costs of the mandated services required budgetary allowances away from the religious purposes of the claimant. However, that would be no more true in the present case than it was in the *Lemon* cases. The fact of an implicit furtherance by any State assistance or aid to sectarian schools whether on a one-time basis or on a continuing basis was recognized in the majority opinion in *Lemon II* (see 411 US, at p 202). As in the case of *Lemon II,* the single proposed payment for services rendered during the period of the presumed constitutionality of the former Mandated Services Act reflects no more than the school's reliance upon the promise of payment for their continuance to exist as institutions of education and providing a level of education required by the State. Indeed, the majority recognize that in *Lemon II* "a constitutional interest arising from the payments was assumed for the purpose of discussion" and yet would undermine the constitutional sanctioning of a one-time payment where there had been reliance upon a presumably constitutional enactment. The failings of the Mandated Services Act and the enactments of Pennsylvania and Rhode Island, while distinguishable for purposes of understanding what will not be permitted in regard to State enactments which provide aid to religious institutions, have no immediately perceivable impact upon the consideration of whether or not a subsequent payment may be made for reliance where the statutes brought under constitutional attack are not upon their face patently an abridgement of the Constitution. The Legislature recognized a *moral* obligation to reimburse the schools for moneys already budgeted and expended.

In *Lemon I* the court was confronted with substantially the same situation that existed in the *Levitt* action. The court in *Lemon I* observed (403 US 602, 623, *supra):* "Here *[Lemon]* we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified."

The present action involving chapter 996 of the Laws of

1972 is more analogous with *Lemon II,* it being a "one shot" payment for services already performed.

In regard to *Lemon II,* the appellant states that as for the constitutional interests the court, after noting that the constitutional fulcrum of *Lemon I* was the excessive entanglement of church and State, observed that the one-time payment of $24,000,000 to nonpublic schools will not substantially undermine the constitutional interests at stake in *Lemon I.* The court also noted two problems having constitutional overtones but held that they were minimal or outweighed by reliance considerations.

The court held that the equities of the reliance by the nonpublic schools on the expectation of reimbursement outweighed the constitutional "interests".

In the present case the Court of Claims found (p 983) that permitting the implementation of chapter 996 of the Laws of 1972 "would have the effect of resurrecting chapter 138 [of the Laws of 1970] which the Supreme Court declared unconstitutional." It reasonably appears that the actual effect of chapter 996 of the Laws of 1972 is to close out the former Mandated Services Act and recognize its unconstitutionality instead of attempting to resurrect the same. In any event, Mandated Services Act (L. 1970, ch. 138) and chapter 996 of the Laws of 1972 are readily distinguishable.

At this posture of the litigation we should be guided by the action of the court in *Lemon II.*

The State, in addition to its argument of Federal unconstitutionality, also contends that the payment of the claim herein would constitute a gift of State money to a private corporation in violation of section 8 of article VII of the New York Constitution or an audit by the Legislature of a private claim in violation of section 19 of article III of the New York Constitution.

It is well settled that the Legislature can direct the payment of claims founded in equity and justice, even though the claim itself would not be enforceable in a court of law *(Oswego & Syracuse R.R. Co. v State of New York,* 226 NY 351; *Lehigh Val. R.R. Co. v Canal B.,* 204 NY 471). In order to justify the Legislature in recognizing a claim against the State based upon a moral obligation or founded on conceptions of equity and justice, there must be present an obligation which would be recognized by men with a keen sense of honor and a real desire to act fairly and equitably without compulsion of law

*(Ausable Chasm Co. v State of New York,* 266 NY 326). In the present case, the sole reason why the claimant did not receive payment for the second semester of the 1971–1972 school year was the fortuitous circumstance that the declaration of unconstitutionality by the courts came before the date set for the payment of the second installment but after the rendering of by far the greater part of the services required. Thus, the great bulk of the mandated services which the claimant was expected to perform and for which, in turn, the claimant expected compensation had already been rendered prior to the issuance of the permanent injunction on June 1, 1972. Consequently, the equitable considerations present in *Lemon II* are, if anything, heightened. In the course of its decision in *Hecht Co. v Bowles* (321 US 321, 329) the Supreme Court addressed itself to these considerations and held that "flexibility rather than rigidity has distinguished [them]. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs."

Sections 1 and 2 of chapter 996 of the Laws of 1972 amply spell out a basis which would justify recognition of the instant claim as a moral obligation and/or founded on concepts of equity and justice.

The purpose of section 19 of article III of the New York Constitution was "to remedy the manifest evils of special legislation in the interest of private claimants" *(Board of Supervisors of County of Cayuga v State of New York,* 153 NY 279, 288). It is readily apparent that chapter 996 is not designed to provide a recovery for any single institution and is applicable to a class which cannot readily be classified as constituting a private special interest. Accordingly, this contention of the Attorney-General is without any particular merit.

Upon approaching chapter 996 it must be remembered that it is supported by a presumption of constitutionality which is not easily overcome. In addition to the presumption, it appears that this one-time payment falls within the realm of that which is constitutionally permissible pursuant to the decision of the Supreme Court in *Lemon II (supra).*

However, it is readily apparent that it was never the intent of the Legislature that any of its funds were to be allowed for the furtherance of religious purposes. In this regard, the audit of the claims by the Court of Claims must serve the same

purpose as the final post audit which was referred to in *Lemon II (supra)*. Accordingly, the burden will be upon the claimant to prove that the items of its claim are in fact solely for mandated services and the burden will be upon the Court of Claims to make appropriate findings in regard thereto.

This dissent may be concluded by observing that in *Lemon II* the court noted that the application of familiar equitable principles must be measured against the totality of circumstances and in the light of the general principle that, absent contrary direction, State officials and those with whom they deal are entitled to rely on a presumptively valid State statute, enacted in good faith and by no means plainly unlawful.

The judgment of the Court of Claims should be reversed and the claim reinstated.

LARKIN, J (dissenting). I dissent and vote to reverse the judgment of the Court of Claims. I agree with the majority that the decision of the United States Supreme Court in *Lemon II* (411 US 192) is controlling on the issue of Federal constitutional law involved in this appeal, but I disagree with the conclusion that *Lemon II* should be distinguished from this case.

While the majority concede that the Supreme Court ascribed "significant weight" to reliance interests in upholding the reimbursement in *Lemon II,* they minimize the true significance accorded in *Lemon II* to the reliance of the affected schools upon payments under the law later held unconstitutional. Equitable considerations governed the reasoning of the Supreme Court in *Lemon II.* The *Lemon II* court weighed the reliance of the schools and found this to offset the remote possibility of constitutional harm which would result from permitting the payments. The same principle applies to this case.

There is no dispute in this case that the appellant school did in fact rely upon reimbursement for services rendered during the second half of the 1971–1972 school year. The majority argue that this case is distinguishable from *Lemon II* because chapter 138 of the Laws of 1970 was declared unconstitutional in *Levitt* for the reason that it did not separate aid to be devoted to secular functions from aid to sectarian activities, whereas the law invalidated in *Lemon I* required so much governmental supervision that an "excessive entanglement"

was fostered between church schools and State. The argument is made that the constitutional interest in this case is somehow "more tangible" because the statutes in the respective cases were struck down for different reasons and because the payments in *Lemon I,* in contrast to those in *Levitt,* were not invalidated "per se". This is a distinction without a difference. In this case, as in *Lemon II,* the function of the judiciary is to weigh the constitutional harm arising from upholding one-time payments which had their origin in services rendered in accordance with a statute subsequently held to violate the United States Constitution, against the equitable consideration of providing reimbursement for services rendered in reliance by the school upon the subsequently invalidated statute.

The majority point out that the remoteness of constitutional harm found by the Supreme Court in *Lemon II* was based upon the fact that the unconstitutional entanglements had already occurred and that no further entanglement would arise from an authorization of the challenged payments. The same reasoning applies to this case. Chapter 996 of the Laws of 1972 does no more than authorize reimbursement for services rendered during the second semester of the 1971–1972 school year. To uphold this statute would no more promote "further" impermissible State aid to religion than the upholding of the statute in *Lemon II* promoted further "oversight of the instructional processes of sectarian schools" *(Lemon v Kurtzman,* 411 US 192, 202).

Finally, the majority emphasize the statement made in Lemon II that the "very process of oversight—now an accomplished fact—assures that state funds will not be applied for any sectarian purposes" (411 US 192, 202–203). Although it is true that no such oversight exists in this case, I disagree with the characterization of this difference by the majority as a "fundamental distinction". Immediately after the sentence in which this statement was made, the *Lemon II* court entered into a several page discussion in which the possibility of constitutional harm was balanced against the reliance of the schools upon the funds. The formulation by the Supreme Court of a remedy based upon this equitable process, not the fact that the oversight therein provided certain constitutional protection, is the real thrust of *Lemon II.*

The instant case comes directly within *Lemon II.* The inter-

ests of fairness and justice dictate upholding the one-time reimbursement for past services authorized by this statute.

SWEENEY and KANE, JJ., concur with GREENBLOTT, J.; HERLIHY, P. J., and LARKIN, J., dissent and vote to reverse in separate opinions.

Judgment affirmed, without costs.