414 F.Supp. 1174 (1976)
COMMITTEE FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY et al., Plaintiffs,
v.
Arthur LEVITT, as Comptroller of the State of New York, and Ewald B. Nyquist, as Commissioner of Education of the State of New York, Defendants,
and
Horace Mann-Barnard School et al., Intervenor-Defendants.
No. 74 Civ. 2648.
United States District Court, S. D. New York.
June 21, 1976.
*1175 Leo Pfeffer, New York City, for plaintiffs.
Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y., for defendants; Ruth Kessler Toch, Sol. Gen., Jean M. Coon, Asst. Sol. Gen., Albany, of counsel.
Davis Polk & Wardwell, New York City, for intervenor-defendants; Richard E. Nolan, Alfred E. Schretter, Thomas J. Aquilino, Jr., New York City, of counsel.
Before MANSFIELD, Circuit Judge, and LASKER and WARD, District Judges.
ROBERT J. WARD, District Judge.
This case requires us to determine whether Chapter 507, as amended by Chapter 508, of the 1974 Laws of New York ("the statute"), which provides for reimbursement to private schools of expenses allocable to the performance of certain state "mandated" pupil testing and record keeping, is offensive to the Establishment Clause of the First Amendment.
Plaintiffs, who commenced this action less than one month after the statute was signed into law, are an association, with numerous organization members, whose objectives include opposition to the use of public funds for the support of sectarian schools, and individual New York State tax-payers. Defendants are the Commissioner of Education and the State Comptroller. Intervenor-defendants are one nonsectarian and four sectarian private schools which receive funds pursuant to the statute. Plaintiffs seek a declaration that the statute is unconstitutional and an injunction against the allocation and use of public funds for the support of religious schools.
Upon the request of the parties, this three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2283. The parties have agreed that the case shall be determined on the pleadings and the defendants' and intervenor-defendants' answers to plaintiff's interrogatories.

I
The statute, which became effective July 1, 1974, provides for reimbursement to nonpublic schools of the "actual cost" of complying with state requirements for pupil attendance reporting and the administration of state prepared examinations such as regents examinations, the pupil evaluation program, and the basic educational data system.[1] These reports and tests are required of public and nonpublic schools alike. *1176 The statute was passed by the Legislature, pursuant to the proposal of the Regents, to replace Chapter 138 of the 1970 Laws of New York which had been declared unconstitutional in Levitt v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973). It was drafted to eliminate those features of Chapter 138 which the Supreme Court found offensive to the First Amendment, specifically reimbursement for traditional teacher-prepared examinations and the failure to limit reimbursement to actual costs incurred.
According to defendants' answers to plaintiffs' interrogatories, there are 1954 nonpublic schools, eligible to receive reimbursement pursuant to the statute, approximately 85% of which are religiously affiliated. Although the characteristics of these sectarian institutions vary widely, schools which
(1) are controlled by churches or religious organizations, (2) have as their purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at or participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, and/or (10) impose religious restrictions on what the faculty may teach
are permissible beneficiaries.[2]
Schools must apply for reimbursement listing the amount claimed for each service rendered separately.[3] Reimbursable costs include teacher salaries, fringe benefits, supplies, and other contractual expenditures such as data processing services. Section 7 of the statute requires schools applying for financial assistance to submit vouchers, capable of audit, to insure the propriety of payment.[4] To implement this section, defendants have promulgated forms which require applicants for reimbursement to list separately the amount claimed for each reimbursable cost for each reimbursable service. For reimbursement of personnel salaries and fringe benefits, the defendants also require the submission of a form entitled "Justification of Salary and Fringe Benefit Costs Claim For State Aid For Testing, Reporting and Evaluating." Such reimbursable costs are calculated on this form by first determining the percentage of total work time spent performing reimbursable services. Gross wages and fringe benefits are then multiplied by the resulting percentage. It should be noted that the resulting reimbursable amount does not represent any additional sum expended over and above ordinary teacher and other personnel compensation, but rather represents a percentage of compensation which would be paid whether or not employee time was spent in performing state required services.
*1177 The statute, also, makes a provision for further audit of underlying records, if necessary, and reimbursement to the state in the event of overpayment.[5] Defendants have promulgated suggested accounting procedures so that records are kept which are capable of such an audit.[6]
From an examination of the intervenor-defendants' answers to plaintiffs' interrogatories, the bulk of reimbursement claimed is for salaries and fringe benefits. The total amounts claimed vary from school to school, depending in part upon the services performed. For example, for teacher salaries and fringe benefits for attendance, the amount claimed varies from approximately 1% to 5.4% of the aggregate cost of these budget items to the different schools. It has been estimated that the cost to the state of providing reimbursement to private schools, pursuant to the statute, will be between $8,000,000 and $10,000,000 annually.

II
The complaint alleges that this statutory scheme for providing financial assistance to sectarian and nonsectarian schools violates the Establishment Clause in that its primary effect is to advance religion and in that it results in an excessive entanglement of state government in religion. The complaint, also, alleges a violation of the Free Exercise Clause of the First Amendment in that the statute constitutes compulsory taxation for the support of religion and religious schools.[7]
Defendants, for their part, argue that the statute does not offend the Constitution because reimbursement is limited to services which are clearly secular and that no excessive entanglement results from the provision for an optional audit of books and accounts in that there is no audit of educational content.

III
We turn now to the constitutional question posed: Whether the First Amendment's prohibition of any law "respecting the establishment of religion" is violated by a state law which provides for direct payments by the state to nonpublic sectarian schools for those portions of their operating costs which are attributable to compliance with state attendance, testing and reporting requirements. The constitutional standards may be easily stated:
"First, the statute must have a secular legislative purpose. . . . Second, it must have a `primary effect' that neither advances nor inhibits religion. . . . *1178 Third, the statute and its administration must avoid excessive government entanglement with religion." Meek v. Pittenger, 421 U.S. 349, 358, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975) (citations omitted).
Unfortunately, these tests are more easily stated than applied.
For it is evident from the numerous opinions of the [Supreme] Court, and of Justices in concurrence and dissent in the leading cases applying the Establishment Clause, that no "bright line" guidance is afforded. Instead, while there has been general agreement upon the applicable principles and upon the framework of analysis, the Court has recognized its inability to perceive with invariable clarity the "lines of demarcation in this extraordinarily sensitive area of constitutional law." Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).
Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 761 n. 5, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). Thus, with due regard for the complexity of the questions, we turn to the application of the standards to the facts of the instant case.
We need not pause long to determine whether the statute passes constitutional muster under the first part of the tripartite test. The legislative purpose is contained in Section 1 of Chapter 507 as follows:
The state has the responsibility to provide educational opportunity of a quality which will prepare its citizens for the challenges of American life in the last decades of the twentieth century.
To fulfill this responsibility, the state has the duty and authority to evaluate, through a system of uniform state testing and reporting procedures, the quality and effectiveness of instruction to assure that those who are attending instruction, as required by law, are being adequately educated within their individual capabilities.
In public schools these fundamental objectives are accomplished in part through state financial assistance to local school districts.
More than seven hundred thousand pupils in the state comply with the compulsory education law by attending nonpublic schools. It is a matter of state duty and concern that such nonpublic schools be reimbursed for the actual costs which they incur in providing services to the state which they are required by law to render in connection with the state's responsibility for reporting, testing and evaluating.
The predecessor statute, Chapter 138, 1970 Laws of New York, had a very similar legislative purpose. In Levitt v. Committee for Public Education & Religious Liberty, supra, the court stated:
We do not doubt that the New York Legislature had a "secular legislative purpose" in enacting Chapter 138.
413 U.S. at 479, n. 7, 93 S.Ct. at 2819. We are constrained to hold likewise here.
The nub of the controversy between the respective parties focuses on the second and, for this case, the crucial test of the primary effect of the statute. Defendants argue that the payments provided by the statute are for "neutral, secular and nonidealogical" services performed by the nonpublic schools to serve the state's secular interests in the education they provide. As such, defendants conclude that these payments do not have the primary effect of advancing religion and that, if anything, there is only the incidental effect that the institutions' funds may be "freed up" for the furtherance of their religious mission. Further, they contend that in Levitt v. Committee for Public Education & Religious Liberty, supra, the court impliedly held that payments such as those authorized by the statute would be constitutionally permissible.
Absent the decision in Meek v. Pittenger, supra, we might have found defendants' arguments persuasive. However, in light of the decision in Meek, we fail to see any alternative but to declare the statute unconstitutional because it has the primary effect of advancing religion.
*1179 At issue, in Meek, was the constitutionality of two Pennsylvania statutes which provided auxiliary services and instructional material and equipment to the nonpublic schools of the state, 75% of which were sectarian in character. Auxiliary services included counseling, testing, psychological services, speech and hearing therapy and special education. Instructional materials included periodicals, photographs, maps, records and films. Instructional equipment included audiovisual and laboratory equipment. The Supreme Court held that the statutes were unconstitutional except insofar as they provided for the loan of textbooks to nonpublic school students. With respect to the loan of instructional material and equipment, the court found that while the materials themselves may be secular and nonideological, the aid thereby provided had the primary and direct effect of advancing the religious mission of the sectarian beneficiaries of the Act. The court stated:
To be sure, the material and equipment that are the subjects of the loanmaps, charts, and laboratory equipment, for example are "self-polic[ing], in that starting as secular, nonideological and neutral, they will not change in use." Meek v. Pittenger, 374 F.Supp. [639], 660. But faced with the substantial amounts of direct support authorized by Act 195, it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and to then characterize Act 195 as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission," state aid has the impermissible primary effect of advancing religion. Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923.
* * * * * *
Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. "[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. . . . For this reason, Act 195's direct aid to Pennsylvania's predominantly church-related, nonpublic elementary and secondary schools, even though ostensibly limited to wholly neutral, secular instructional material and equipment, inescapably results in the direct and substantial advancement of religious activity, cf. Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S., at 781-783 and n. 39, 93 S.Ct., at 2971, and thus constitutes an impermissible establishment of religion.
421 U.S. at 365-66, 95 S.Ct. at 1763 (footnote omitted).
We need only repeat what the Court stated in Meek to dispose of the constitutional question here. In the present case, it is conceded that the attendance taking and test administration are performed during regular school hours by school personnel and would be so performed whether or not reimbursement is available. It is, also, conceded that the payments made pursuant to the statute do not represent extraordinary expenditures necessitated primarily by compliance with state requirements. In order to continue to qualify as institutions providing an educational alternative to public schools, the private school beneficiaries must continue to comply with the state's reporting and testing requirements. See, e. g., N.Y. Education Law §§ 214-216, 3210, subd. 2, 3211 (McKinney's 1969, 1970). Compliance with state laws regulating education is as much a part of the educational function of private schools as classroom instruction in secular subjects.[8] For the state *1180 to reimburse private schools for compliance in the manner provided by the statute is, in reality, to subsidize their operating costs. In light of these facts, it is clear that the aid to the secular functions of sectarian schools provided by the statute is in fact aid to the sectarian school enterprise as a whole and results in the direct advancement of religion.
The sole basis offered by defendants and intervenors for distinguishing the decision in Meek from the instant case is that the monetary aid provided any one school is insubstantial in terms of each school's operating expenses. We cannot agree. In Meek, the court characterized the $12 million authorized to be paid to the 1320 nonpublic schools of Pennsylvania of which 75% had religious affiliations as "massive" and "substantial". We can perceive no legally relevant distinction between the $12 million of public funds involved in Meek and the $8-$10 million at issue here.
Moreover, the touchstone under the Establishment Clause is not how much public support any one religious institution receives but rather that public funds are used to support religion in general.
"No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion."
Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947).
Since the statute under consideration thus fails to meet the second prong of the standard established by the Supreme Court for constitutional review of such provisions, it becomes unnecessary to decide whether it satisfies the third requirement, avoidance of excessive entanglement with religion.
Accordingly, we hold that Chapter 507, as amended by Chapter 508, is unconstitutional to the extent that it authorizes the allocation of funds to sectarian schools and we enjoin the application of the Act to such schools.[9]
Settle judgment on notice.
NOTES
[1] The operative provision of the statute is contained in § 3, which provides:

The commissioner shall annually apportion to each qualifying school, for school years beginning on and after July first, nineteen hundred seventy-four, an amount equal to the actual cost incurred by each such school during the preceding school year for providing services required by law to be rendered to the state in compliance with the requirements of the state's pupil evaluation program, the basic educational data system, regents examinations, the statewide evaluation plan, the uniform procedure for pupil attendance reporting, and other similar state prepared examinations and reporting procedures.
[2] Although four of the intervenor-defendants are religiously affiliated, none meets all of the characteristics enumerated in the text.
[3] Section 4 of the statute provides:

Each school which seeks an apportionment pursuant to this act shall submit to the commissioner an application therefor, together with such additional reports and documents as the commissioner may require, at such times, in such form and containing such information as the commissioner may prescribe by regulation in order to carry out the purposes of this act.
[4] Section 7 states in pertinent part:

No application for financial assistance under this act shall be approved except upon audit of vouchers or other documents by the commissioner as are necessary to insure that such payment is lawful and proper.
[5] Section 7 of the Act provides in pertinent part:

The state department of audit and control shall from time to time examine any and all necessary accounts and records of a qualifying school to which an apportionment has been made pursuant to this act for the purpose of determining the cost to such school of rendering the services referred to in section three of this act. If after such audit it is determined that any qualifying school has received funds in excess of the actual cost of providing the services enumerated in section three of this act, such school shall immediately reimburse the state in such excess amount.
[6] Section 5 of the statute provides:

Each school which seeks an apportionment pursuant to this act shall maintain a separate account or system of accounts for the expenses incurred in rendering the services required by the state to be performed in connection with the reporting, testing and evaluation program enumerated in section three of this act. Such records and accounts shall contain such information and be maintained in accordance with regulations issued by the commissioner, but for expenditures made in the school year nineteen hundred seventy-three seventy-four, the application for reimbursement made in nineteen hundred seventy-four pursuant to section four of this act shall be supported by such reports and documents as the commissioner shall require. In promulgating such record and account regulations and in requiring supportive documents with respect to expenditures incurred in the school year nineteen hundred seventy-three seventy-four, the commissioner shall facilitate the audit procedures described in section seven of this act. The records and accounts for each school year shall be preserved at the school until the completion of such audit procedures.
[7] Plaintiffs have not pressed this claim before the Court. In view of our disposition on Establishment Clause grounds, we do not reach the Free Exercise claim.
[8] Of course, the mere application of a state law to a school system does not necessarily "regulate education." See, e. g., Meek v. Pittenger, 421 U.S. 349, 364, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975).
[9] Chapter 508 added a severability clause to the Act reading as follows:

§ 9. In enacting this chapter it is the intention of the legislature that if section seven or any other provision of this act or any rules or regulations promulgated thereunder shall be held by any court to be invalid in whole or in part or inapplicable to any person or situation, all remaining provisions or parts thereof or remaining rules and regulations or parts thereof not so invalidated shall nevertheless remain fully effective as if the invalidated portion had not been enacted or promulgated, and the application of any such invalidated portion to other persons not similarly situated or other situations shall not be affected thereby. Unlike the situation in Meek v. Pittenger, see 421 U.S. at 371 n. 10, 95 S.Ct. 1753, this clause is a clear statement of the legislature's intent to have the act remain in force as applied to nonsectarian schools, even if its application to sectarian schools were held to violate the Establishment Clause. Compare Sloan v. Lemon, 413 U.S. 825, 833-34 & n. 10, 93 S.Ct. 2982, 37 L.Ed.2d 939.