William BAIRD et al., Plaintiffs,

v.

Kevin H. WHITE, as he is Mayor of the City of Boston, Defendant.

Civ. A. No. 79–1886–S.

United States District Court, D. Massachusetts.

Sept. 25, 1979.

Joan C. Schmidt, Boston, Mass, for plaintiffs.

John L. Keefe, City Law Dept., Boston, Mass., for defendant.

## MEMORANDUM AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

SKINNER, District Judge.

This action arises out of the proposed visit of Pope John Paul II to Boston on October 1, 1979. The plaintiffs originally sought to enjoin the Mayor of the City of Boston from permitting the use of Boston Common for a papal Mass, from expending municipal funds for various platforms, crowd control devices and sound equipment incidental to the celebration of the Mass and from permitting access to part of the Common to be limited to holders of tickets issued by the Archdiocese of Boston.

Of these three issues only one remains for consideration. The plaintiffs no longer contest the city's permit to the Archdiocese of Boston for the use of part of Boston Common for the celebration of the Mass, nor do they contest the installation of the various platforms and other attendant paraphernalia which will in fact be paid for by the Archdiocese. ·

The plaintiffs state the remaining issue as follows:

May the city permit the Archdiocese to decide who shall be admitted to a restricted area adjacent to the Papal altar without violating the establishment clause of the First Amendment to the Constitution of the United States.

The defendant would state the issue in its reverse posture:

May the city, after having granted the permit, interfere in the manner in which that permit is to be exercised without violating both the establishment and the free exercise clauses of the First Amendment.

This matter is before me on the plaintiffs' motion for a temporary restraining order. There has been a plenary hearing, however, with briefs and arguments from both sides and the presentation of evidence. The motion will accordingly be treated as a motion for a preliminary injunction.

■ The granting of preliminary relief in this Circuit is conditioned on a showing by the plaintiffs of a likelihood that they would succeed on the merits at trial and that they are likely to suffer immediate, irremediable harm if the preliminary relief is not granted.[1] In First Amendment cases, however, irremediable harm is presumed from any violation of the establishment and free exercise clauses.[2] The court then is not required to come to a definitive conclusion on these difficult questions on short notice, but to determine only the likelihood of plaintiffs' success on the merits if the case were to be fully considered.

The permit granted to the Archdiocese covers about one-third of Boston Common known as the parade ground, consisting of an open grassy area sloping westward toward Charles Street. The altar will be placed at the westerly line of the area facing east. The Archdiocese plans to cordon off a large semi-circular area in front of the altar, admission to which will be by ticket only. Tickets have been issued by the Archdiocese, and the selection of ticket holders has been made by its representatives. The total number of persons within the enclosure will be between 18,000 and 19,000 persons, roughly divided as follows:

6,000 priests and members of religious orders (unseated).

10,000 youth (unseated). Approximately 8,000 of these tickets are to be distributed by parish priests and the remainder by Catholic chaplains in various schools and colleges. Distribution is not restricted to Catholic youth.·

2,000 "invited guests" (unseated). These consist of about 1,000 security personnel and the remainder prominent Catholic laity.

150 representatives of ethnic groups (seated).

120 civic leaders (seated).

250 leaders of other religions (seated).

100 handicapped persons (seated) to be chosen by lot.

20 or 30 seated bishops.

There was testimony by the Auxiliary Bishop and Vicar General of the Archdiocese, that while the Mass would be celebrated by the Pope and certain bishops only, the people within the enclosure, and to a lesser degree everybody on the Common, would be participants in the Mass and not simply spectators of the celebration.

■ Plaintiffs maintain that the City of Boston violates the establishment clause by

---

1. *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 390 F.2d 113, 115 (1st Cir. 1968).

2. *Public Funds For Public Schools of New Jersey v. Marburger,* 358 F.Supp. 29, 43 (D.N.J. 1973). *Cf. Dombrowski v. Pfister,* 380 U.S. 479, 486–7, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Lewis v. Kugler,* 446 F.2d 1343, 1350 (3rd Cir. 1971); *Schnell v. City of Chicago,* 407 F.2d 1084, 1086 (7th Cir. 1969).

delegating control and management of the Boston Common to the Archdiocese of Boston, which plans to restrict access for non-secular reasons. Governmental actions, to stay within the strictures of the establishment clause, must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. *Committee For Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). Plaintiffs argue that the establishment of limited access areas for viewing of the religious service by persons selected by the Church transgresses all three prongs of the *Nyquist* test. The city, by permitting this arrangement, allegedly advances the Catholic religion, to the detriment of other religions, for the non-secular purpose of aiding religious worship. Finally, the Archdiocese has become an arm of the city government, thereby impermissibly entangling church and state affairs.

The defendant suggests an analogy to a parade permit. Once the permit is issued for the exclusive use of a public street, the municipality is not entitled to direct who will be in the parade or their order of march, or who will be on the reviewing stand, except for public safety considerations.[3] The defendant says that the people selected for admission within the enclosure are like the marchers in the parade. Plaintiffs liken them to the spectators on the sidewalk, over whom the holder of the permit could exercise no control. This is an interesting analogy, but I do not find it wholly apposite. It ignores the fact that by permitting these ticketing arrangements, the city is implicitly allowing preferential access to a section of public land to those who in overwhelming majority are members of, or invitees of, a specific religious

institution. The city is thus arguably violating the establishment clause by permitting the Archdiocese to determine admission to the Boston Common.

■ The case must be viewed in the context of a permit to celebrate the Mass, the propriety of which is no longer contested.[4] The delegation to the Church of control over access to the adjacent section of the Common does not implicate any of the specific evils against which the Constitution erects a "wall of separation between Church and State." *Cf. Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947). The Supreme Court has avoided a rigid and absolutist view of the areas of separation. *Walz v. Tax Commission*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). In upholding the release of public school children for religious instruction off of school property, the Court articulated guiding considerations:

> The First Amendment . . . does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other.
>
> *     *     *     *     *     *
>
> We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it

---

**3.** This hypothesis is not supported by any cited authority, but it is probably true.

**4.** While there are numerous cases applying the *Nyquist* test to a variety of affirmative statutory programs, none of them speak to the novel facts of this case. *Compare Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) *with Wolman v. Walter*,

433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *see also Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pettinger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Levitt v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973).

then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups.

*Zorach v. Clauson*, 343 U.S. 306, 312–14, 72 S.Ct. 679, 683–84, 96 L.Ed. 954 (1952).[5]

Implicit in the grant of a permit for a papal Mass is the right of the celebrants to have the appropriate officials attend the Pope in the performance of his offices. The free exercise clause arguably requires the city to allow the celebrants to carry out the religious purpose of a public Mass by insuring that those in immediate proximity to the celebration be sympathetic and knowledgeable communicants who will be able to respond appropriately to the celebrants at the various stages of the ceremony. May this argument be properly applied to 18,000 persons?

Although I conclude that control over an attendant group of some size is a normal incident of the permit for the Mass, if the Church is not permitted to decide the size of that group, then the city or the court must make the decision. In my view, any such intervention in the exercise of the permit would constitute a threat to the spirit of accommodation mandated in *Zorach, supra,* which outweighs the risk that the temporary ecclesiastical control of access to part of the Common might lead to the evils against which the "wall of separation" has been erected. *Cf. Everson v. Board of Education, supra.*

Balancing these considerations, it is my opinion that the plaintiffs are not likely to succeed on the merits, and the preliminary injunction should not issue.

In view of the result that I have reached, I do not feel it necessary to give extended consideration to the questions of jurisdiction and standing raised by the defendant. I have no doubt of the court's broad jurisdiction to hear and resolve cases and controversies in which there is an alleged violation of the establishment and free exercise clauses of the First Amendment.

The plaintiff Baird sues only as the president of a corporation which pays taxes in the City of Boston. Now that the issue of payment for the platforms and other paraphernalia has been resolved, I find that he has no standing to pursue the case. I know of no case that grants constitutional protection to the religious sensibilities of a business corporation. The plaintiff Farkas has standing, however, as a resident of Boston.[6]

For the reasons stated, the motion for a preliminary injunction is DENIED.

---

**5.** This case should not be cited without reference to its opposite number, *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). In that case, released time for religious instruction was held to violate the establishment clause where the instruction took place on the school property. To the extent that the use of public land is the critical factor distinguishing *McCollum* from *Zorach*, *McCollum* appears superficially to be closer to

the present case than *Zorach*. The distinction becomes relatively insignificant once the propriety of the permit is conceded. Moreover, as Professor Tribe has pointed out, the critical factor in *McCollum* was "the special place of public schools in American life." L. Tribe, American Constitutional Law 825 (1978).

**6.** *Allen v. Hickel*, 138 U.S.App.D.C. 31, 33–4, 424 F.2d 944, 946–7 (D.C. Cir. 1970).