Let an order issue accordingly.

COMMITTEE FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY, Bert Adams, Barbara Brook, Naomi Cowen, Robert B. Essex, Florence Flast, Charlotte Green, Helen Henkin, Martha Laties, Blanche Lewis, Ellen Meyer, Rev. Arthur W. Mielke, Edward D. Moldover, Aryeh Neier, David Seeley, Howard M. Squadron, Charles H. Sumner and Cynthia Swanson, Plaintiffs,

v.

Arthur LEVITT, as Comptroller of the State of New York, and Ewald B. Nyquist, as Commissioner of Education of the State of New York, Defendants,

and

Horace Mann-Barnard School, La Salle Academy, Long Island Lutheran High School, St. Michael School and Yeshivah Rambam, Intervenor-Defendants.

No. 74 Civ. 2648.

United States District Court, S. D. New York.

Dec. 11, 1978.

**1124**

Leo Pfeffer, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Dept. of Law, Albany, N. Y. by Jean M. Coon, Asst. Sol. Gen., Albany, N. Y., for defendants.

Davis, Polk & Wardwell, New York City, for intervenor-defendants Horace Mann-Barnard School, La Salle Academy, Long Island Lutheran High School and St. Michael School; Richard E. Nolan, Thomas J. Aquilino, Jr., New York City, of counsel.

Dennis Rapps, National Jewish Commission on Law and Public Affairs, Brooklyn, N. Y., for intervenor-defendant Yeshivah Rambam.

Before MANSFIELD, Circuit Judge, LASKER and WARD, District Judges.

## OPINION

MANSFIELD, Circuit Judge:

For the second time we are required to pass upon the constitutionality of Chapter 507, as amended by Chapter 508, of the 1974 Laws of New York ("the Statute"), which authorizes the State to reimburse private schools for the cost of performing certain state-mandated pupil testing and record keeping. The statute has its background in *Levitt v. Committee for Public Education,* 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) (*Levitt I*), where the Supreme Court struck down an earlier New York statute on the same subject as violative of the First Amendment's Establishment Clause, applicable to the states through the Fourteenth Amendment, on the grounds that it authorized State financing of tests prepared by sectarian school teachers which might be used for religious instruction and that the Statute had no auditing provisions designed to insure that sectarian schools would be reimbursed by the State only for secular services.

In 1974 the New York legislature responded by enacting the Statute presently under review, which sought to remedy the features found objectionable by the Supreme Court by providing for State preparation of the tests and auditing procedures to assure that private schools would be reimbursed only for these State-mandated services. Thereafter, in *Committee for Public Education and Religious Liberty v. Levitt,* 414 F.Supp. 1174 (1976) (*Levitt II*), we held that despite these changes the amended Statute did not pass muster under the Establishment Clause.[1] In doing so we relied heavily on *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), which postdated *Levitt I.* One year

---

1. The plaintiffs' complaint also alleged that the Statute violated the Free Exercise Clause. That claim was not pressed in the first hearing of the case, and our decision on the Establishment Clause made it superfluous. The plaintiffs have not pressed the theory in the argument following remand, so we have not addressed it. We do note that the Supreme Court has rejected previous attempts to invalidate public financial assistance to sectarian schools under the Free Exercise Clause. *Tilton v. Richardson,* 403 U.S. 672, 689, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Board of Education v. Allen,* 392 U.S. 236, 248–49, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

after our decision the Supreme Court decided *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), following which it vacated our judgment in *Levitt II* and remanded the case for reconsideration in light of *Wolman*. Three justices voted to affirm our decision. 433 U.S. 902, 97 S.Ct. 2963, 53 L.Ed.2d 1086 (1977).[2]

Following remand we held an evidentiary hearing to receive proof relevant to the issues. With commendable cooperation the parties succeeded in agreeing upon the pertinent evidence which was then furnished to us in the form of a stipulation of facts and exhibits. Since *Wolman* has in our view relaxed some of *Meek*'s constitutional strictures against state aid to sectarian schools we now conclude, upon application of *Wolman*'s standards to the record before us, that amended Chapter 507 may be upheld as constitutional.

■ The amended Statute, which became effective July 1, 1974, provides for reimbursement to private schools of the "actual cost" of complying with State requirements for public attendance reporting and the administration of State-prepared standardized examinations such as Regents examinations and the pupil evaluation program. These reports and tests are required of public and private schools alike and are designed to improve the educational program offered in New York schools.

The Statute authorizes reimbursements for two categories of services: the administration of State-prepared examinations and the execution of State-required reporting procedures. The State prepares a large number of examinations for use in evaluating the quality of the education received in New York schools and the abilities of individual students. At the present time, most of these tests are administered within one of three major examination programs. First, there is the Pupil Evaluation Pro-

gram (PEP), consisting of standardized reading and mathematics achievement tests. These tests must be administered to all students in grades 3 and 6. Tests for ninth grade students are also prepared for use by schools on an optional basis. These tests are entirely multiple-choice, objective examinations and can be graded by hand or machine. Complete instructional manuals for giving and scoring the examinations are furnished to the school by the State. The scores are returned by school personnel to the State Education Department.

The second battery of tests are the comprehensive achievement tests (Regents "end-of-the-course" examinations) based on State courses of study for use in grades 9 through 12. Presently provided in 19 subjects,[3] these tests consist largely or entirely of objective questions with multiple-choice answers. Some of the examinations contain one or two essay questions or mathematical problems involving extended answers, which, of course, cannot be graded mechanically. Detailed instructional manuals are furnished by the State to schools for the administration of these exams and rating guides for their scoring of them. Each school is required to submit the passing and failing papers in certain subjects to the State Education Department for review. After the March/April and August exam dates, schools return all completed exam papers. In January and June a random sampling procedure is used by the State to select completed examination papers for review.

The third principal set of examinations is the Regents Scholarship and College Qualification Test (RSCQT), which has been used as a basis for awarding scholarships to New York high school students and for admitting students to various units of the State University. All answer papers for the RSCQT are scored at the State Education Department.

---

**2.** The vote of the other six Justices to vacate and remand does not express an opinion on the merits. See *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973).

**3.** Biology; Bookkeeping and accounting II; Business law; Business mathematics; Chemis-

try; Earth science; English; French; German; Hebrew; Italian; Latin; Ninth year mathematics; Tenth year mathematics; Eleventh year mathematics; Physics; Shorthand II and transcription; Social Studies; and Spanish.

The Statute also authorizes reimbursements to private schools for the cost of preparing informational reports required by State law. Each year, private schools must submit to the State a Basic Educational Data System (BEDS) report. This report contains information regarding the student body, faculty, support staff, physical facilities, and curriculum of each school. Schools are also required to submit annually a report showing the attendance record of each minor who is a student at the school. N.Y. Educ.Law § 3211 (McKinney).

Schools which seek reimbursement must "maintain a separate account or system of accounts for the expenses incurred in rendering" the reimbursable services, and they must submit to the N.Y. State Commissioner of Education an application for reimbursement with additional reports and documents prescribed by the Commissioner. Chapter 507, as amended, §§ 4–5. Reimbursable costs include proportionate shares of the teachers' salaries and fringe benefits attributable to administration of the examinations and reporting of State-required data on pupil attendance and performance, plus the cost of supplies and other contractual expenditures such as data processing services. Applications for reimbursement cannot be approved until the Commissioner audits vouchers or other documents submitted by the schools to substantiate their claims. §§ 6–7. The Statute further provides that the State Department of Audit and Control shall from time to time inspect the accounts of recipient schools in order to verify the cost to the schools of rendering the reimbursable services. If the audit reveals that a school has received an amount in excess of its actual costs, the excess must be returned to the State immediately. § 7. It is estimated that the reimbursements to private schools under the Statute will amount to $8,000,000 to $10,000,000 a year.

The lion's share of the reimbursements to private schools under the Statute would be for attendance-reporting. According to applications prepared by intervenor-defendant private schools for the 1973–1974 school year, between 85% and 95% of the total reimbursement is accounted for by the costs attributable to attendance-taking, of which all but a negligible portion represents compensation to personnel for this service. However, the total amount paid for these attendance-taking services amounted to only approximately 1% to 5.4% of the total amount budgeted by the schools for salaries and fringe benefits.

## DISCUSSION

The late Justice Harlan once observed that "it is far easier to agree on the purpose that underlies the First Amendment's Establishment and Free Exercise Clauses than to obtain agreement on the standards that should govern their application." *Walz v. Tax Commission*, 397 U.S. 664, 694, 90 S.Ct. 1409, 1424, 25 L.Ed.2d 697 (1970). However, in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court established three criteria for a constitutional grant of State assistance to sectarian institutions: (1) the assistance program must have "a secular legislative purpose," (2) it must not have a "primary effect" of advancing or inhibiting religion, and (3) it must not excessively entangle the government in the affairs of sectarian institutions.

This now familiar tripartite test may have given some orderliness to Establishment Clause analysis, but for the most part it has simply identified more precisely the areas of uncertainty. Unfortunately, Justice Harlan's observation is as appropriate now as it was in 1970. We still face confusing and imprecise dictates. However, in such additional light as is shed by *Wolman*, we believe that the Statute here does not transgress the "blurred, indistinct and variable" limitations imposed upon federal and state governments by the Establishment Clause. 403 U.S. at 614, 91 S.Ct. 2105.

As in *Levitt II*, we can pass quickly over the first leg of the Establishment Clause test. The statute clearly manifests a secular legislative purpose. See 414 F.Supp. at 1178. The central issue, as frequently happens in cases involving the Establishment Clause, is whether the Statute has a "primary purpose" (which includes a "direct

and immediate effect," *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)), of advancing religion. In *Levitt II* we concluded that *Meek v. Pittenger, supra,* virtually mandated our holding that the Statute had such an effect, since the Supreme Court there ruled that "substantial aid to the educational function of [sectarian] schools . . . necessarily results in aid to the sectarian school enterprise as a whole." If, as seemed to be the case, the Court considered the secular and religious dimensions of education provided in sectarian schools to be inseparable, it appeared to us to follow that direct aid to such schools, "even though ostensibly limited to wholly neutral, secular instructional material and equipment, inescapably results in the direct and substantial advancement of religious activity." 421 U.S. at 366, 95 S.Ct. at 1764. We reasoned that since administration of examinations and record keeping are "as much a part of the educational function of private schools as classroom instruction in secular subjects," the State subsidies for these secular functions aided the sectarian enterprise as a whole and thereby directly advanced religion. 414 F.Supp. at 1179.

The concept that religion so pervades lower sectarian schools that even wholly secular instruction or equipment is always subject to the risk of religious orientation, rendering separation of secular and religious educational functions extremely difficult, has repeatedly been posed by the Supreme Court as an inherent problem faced in determining the constitutionality of state aid to sectarian schools. See *Lemon v. Kurtzman,* 403 U.S. 602, 618–19, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Levitt I, supra,* 413 U.S. at 480, 93 S.Ct. 2814; cf. *Tilton v.*

*Richardson,* 403 U.S. 672, 680–81, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1970) (this concept inapplicable to church-affiliated colleges). It appeared to us that in *Meek* the Court, in lieu of a case-by-case analysis of evidence to assess the degree of risk that state aid might be used for religious purposes, was establishing a *per se* rule prohibiting *any* state aid to educational activities carried out in sectarian schools, except for the loan of textbooks to students, which was upheld in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Indeed Justice Stewart observed in his plurality opinion that the "diminished probability" that religious doctrine might become intertwined with secular instruction would not render state aid permissible as long as the potential existed. 421 U.S. 370–71, 95 S.Ct. 1753. Applied consistently, *Meek* would allow only state aid coming under the mantle of "general welfare" programs serving the health and safety of school children.[4] See *Wolman, supra,* 433 U.S. at 262, 97 S.Ct. 2593 (Powell, J., concurring in part and dissenting in part).

Although *Wolman* does not expressly renounce *Meek*'s theory that aid to a sectarian school's education activities is *per se* unconstitutional,[5] it does revive the more flexible concept that state aid may be extended to such a school's educational activities if it can be shown with a high degree of certainty that the aid will only have secular value of legitimate interest to the State and does not present any appreciable risk of being used to aid transmission of religious views.[6] See 433 U.S. at 240, 244, 247–48, 251, 254, 97 S.Ct. 2593. It is this concept which we apply to the provisions of the statute before us.

---

4. *Meek* did sustain the constitutionality of State expenditures for secular school textbooks to be loaned to sectarian school children or their parents. Such assistance, first sanctioned in *Allen, supra,* would be indefensible under a strict application of *Meek*'s rationale. In *Wolman* the Court indicated that *Allen* is now followed solely in deference to *stare decisis* and, consequently, is limited to its facts.

5. Indeed, Justice Blackmun's opinion for the Court in *Wolman* recites some of Justice Stewart's sweeping language in *Meek,* 433 U.S. at 249–50, 97 S.Ct. 2593.

6. Of course, this certainty must be achieved without an excessive entanglement of the State with the sectarian institution. We examine the entanglements issue separately, *infra,* pp. 1130–1131.

In *Wolman* the Court upheld a section of an Ohio statute authorizing expenditure of State funds:

"To supply for use by pupils attending nonpublic schools within the district such standardized tests and scoring services as are in use in the public schools of the state." Ohio Rev.Code Ann. § 3317.06(J) (Supp.1976).

The State of Ohio furnished the tests which were administered and scored by state personnel. Justice Blackmun reasoned that as the sectarian schools were unable to control the content or result of state-prepared examinations, there was no substantial danger that the exams would be used for religious teaching. 433 U.S. at 240, 97 S.Ct. 2593. If, as the Court had asserted in *Meek,* the secular and religious dimensions of sectarian school education were inseparable, the examinations thus provided and graded by the State would have furthered religious education, even though they covered only secular subjects. *Wolman,* then, must be viewed as rejecting the concept that State support for educational activities necessarily advances religion.

In the present case all tests provided under the Statute, like those supplied under the Ohio law, are prepared by the State. However, except for the RSCQT exams, which are graded exclusively by personnel of the State Education Department, the tests furnished by New York State, unlike those supplied under the Ohio statute, are administered and graded by sectarian school personnel, for whose services in performing this task and in taking attendance the private schools are reimbursed by the State. The question, therefore, is whether these features of the New York law represent a sufficient distinction from *Wolman* to render it inapplicable and to call for nullification of the Statute. We think not. Although these features render the constitutionality of the New York Statute a closer question than that presented by the Ohio law in *Wolman,* the risk of the New York examinations or services being diverted to religious purposes is altogether too insubstantial to require a departure from *Wol-*

*man.* The secular nature of the examinations and the almost entirely mechanical method prescribed for their administration as well as for attendance-taking precludes any substantial risk that the examinations or services will be used for injection or inculcation of religious views or principles, even in a pervasive religious atmosphere. The careful auditing procedure, moreover, insures that State aid will be restricted to these secular services.

Turning first to the RSCQT examinations, the risk of their being used for religious purposes through grading is nonexistent, since they are corrected exclusively by State Education Department personnel. The tests administered under the Pupil Evaluation Program (PEP) consist entirely of objective, multiple-choice questions, which can be graded by machine and, even if graded by hand, afford the schools no more control over the results than if the tests were graded by the State.

Similarly, the overwhelming majority of the questions on the comprehensive achievement tests consist of objective inquiries requiring the student to choose between multiple answers, which leave no room for any possible religious indoctrination. Although some of the comprehensive achievement examinations may, among scores of multiple-choice questions, have a question asking students to write an essay on one of several topics specified in the exam, which conceivably could be used by an instructor to gauge a student's grasp of religious ideas and to grade the answer accordingly, the likelihood of such an event is so minimal and the State procedures designed to guard against serious inconsistencies in grading are so complete that there is no "substantial risk that these examinations . . . will [be administered] with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church." *Levitt I, supra,* 413 U.S. at 480, 93 S.Ct. at 2819. Moreover the State's guidelines for each achievement test and the review procedures (described above) provide

an adequate check against any misuse of essay questions.[7]

In short, any benefit to religious indoctrination from the administration of the State examinations by sectarian personnel is at best "indirect" and "incidental" to the secular value of the exams. As the Supreme Court pointed out in *Nyquist, supra,* 413 U.S. at 771, 93 S.Ct. at 2965, "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid." In the absence of some other potential for diversion we fail to find the possible indirect benefit from this feature of the Statute sufficient to warrant its nullification.

The second distinction between the Ohio statutory provision upheld in *Wolman* and the New York Statute is that the latter, unlike the former, authorizes direct reimbursement to non-public schools for their administration of the exams and for attendance-taking. Although the Supreme Court has on occasion noted the absence of authorization for direct payment to a sectarian school as a factor to be considered, see *Wolman, supra,* 433 U.S. at 253, 97 S.Ct. 2593; *Lemon, supra,* 403 at 621, 91 S.Ct. 2105; and *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court has never declared a statute unconstitutional because of its presence. Putting aside the question of whether direct financial aid can be administered without excessive entanglement by the State in the affairs of a sectarian institution, there does not appear to be any reason why payments to sectarian schools to cover the cost of specified activities would have the impermissible effect of advancing religion if the same activities performed by sectarian school personnel without reimbursement but with State-furnished materials have no such effect. We have already determined that the State does not promote religious education by furnishing and allowing sectarian staff members to grade State-prepared exams. Accordingly, the State does not improperly promote religion when it reimburses the schools for the cost of administering the exams.

■ The Supreme Court's disapproval of statutes authorizing cash payments has turned on the fact that no reasonable guarantee was provided for insuring that the money would be applied only to secular activities. See, e. g., *Levitt I, supra,* 413 U.S. at 480, 93 S.Ct. 2814; *Nyquist, supra,* 413 U.S. at 774, 93 S.Ct. 2955; *Lemon, supra,* 403 U.S. at 619–22, 91 S.Ct. 2105. In each of these cases the Court found either that no effort had been made to restrict the benefit of the financial aid to wholly secular activities or that any efforts to do so would have involved an intolerable level of state surveillance of the sectarian institutions. *Levitt I, supra,* 413 U.S. at 480, 93 S.Ct. 2814; *Nyquist, supra,* 413 U.S. at 780,

---

7. Our dissenting brother takes the view that a one-time annual review of the State-prepared examination materials will not suffice to ensure the neutrality of the State aid. Examinations prepared by State personnel for use in *all* schools in the State (public and private), however, unlike the examinations prepared by sectarian school teachers in *Levitt I,* do not present a "substantial risk" of being designed, unconsciously or otherwise, to further religious education. It was the presence of this risk that induced the Supreme Court to hold in *Levitt I* that the State could not reimburse sectarian schools for the cost of administering in-class examinations and to hold in *New York v. Cathedral Academy,* 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977), that the State could not provide reimbursements for costs incurred prior to the decision in *Levitt I* without making a detailed inquiry into the content of each examination, which itself would violate the Establishment Clause. See 413 U.S. at 480, 93 S.Ct. 2814, 434 U.S. at 131, 98 S.Ct. 340.

We see no indication in either of these decisions that the State would have to make individual determinations regarding the neutrality of State-prepared examinations. Indeed, in *Wolman* the Court recognized as a general rule that the performance by state personnel of their functions outside of the sectarian school environment does not present any significant danger of promoting religious values, even when their functions relate directly to the educational process. 433 U.S. at 247–48, 97 S.Ct. 2593. Accordingly, in the absence of any reason for believing that State-prepared examinations here might be radically changed to elicit or encourage religious views, our determination that the examinations do not foster religion should be definitive.

93 S.Ct. 2955; *Lemon, supra*, 403 U.S. at 620–22, 91 S.Ct. 2105; cf. *Walz, supra*, 397 U.S. at 675, 90 S.Ct. 1409. These decisions thus imply that direct cash payments are permissible if they serve exclusively secular purposes and do not involve excessive entanglement. For example, in *Levitt I*, where the Court struck down the predecessor to amended Chapter 507, the Court commented that the invalid lump-sum payments could not be reduced by a court to "an amount corresponding to the actual costs incurred in performing reimbursable secular services" because this "is a legislative, not a judicial, function." 413 U.S. at 482, 93 S.Ct. at 2820. The implication is that if the legislature chose to exercise its power to fund purely secular activities, the Court would not stand in the way. See *Nyquist, supra*, 413 U.S. at 774, 93 S.Ct. 2955. In sum a statute does not foster religious education simply because it provides aid in cash rather than in kind.

Turning to the Statute's reimbursement of a sectarian school's attendance-taking, as distinguished from administration of examinations, since record-keeping is essentially a ministerial task lacking ideological content or use, it is not challengeable on *Meek*'s theory that any state assistance to the educational process advances religion. Of course it might be argued that since sectarian schools would otherwise be required to expend funds for the taking and recording of attendance, they benefit to the extent that reimbursement facilitates an activity that is essential to the conduct of the sectarian enterprise as a whole or at least "frees up" funds for religious purposes. The "freeing-up" argument, however, has been consistently rejected by the Supreme Court. See, e. g., *Nyquist, supra*, 413 U.S. at 775, 93 S.Ct. 2955. Although record-keeping may be part of the operation of a sectarian school, we do not view it as approaching the status of a facility such as a

classroom, which might be used for secular education, see *id.* In our view it is closer to the operation of buses for the transportation of children to sectarian schools, the cost of which may be reimbursed by the State without violation of the Establishment Clause. *Everson v. Board of Education, supra.* Although school busing may be analogized to "general welfare" services of the type upheld in *Meek* and *Wolman*, the Court in *Wolman* rationalized reimbursement for busing as permissible for the reasons that the activity is unrelated to any aspect of the curriculum and the school does not determine the frequency of the activity subsidized. 433 U.S. at 253, 97 S.Ct. 2593. In view of *Wolman*'s affirmation of this aspect of *Everson* we are satisfied that the State's subsidization of attendance-taking in the present case should be upheld, particularly in the absence of any suggestion that such record-keeping can be used to foster an ideological outlook.

Having concluded that amended Chapter 507 passes the primary-purpose test, we pass on to the question of whether it excessively entangles the State in the administration of sectarian institutions, an issue which we were not required to resolve in *Levitt II*, in view of our holding there. 414 F.Supp. at 1180.

 Where a state is required in determining what aid, if any, may be extended to a sectarian school, to monitor the day-to-day activities of the teaching staff, to engage in onerous, direct oversight, or to make on-site judgments from time to time as to whether different school activities are religious in character, the risk of entanglement is too great to permit governmental involvement. See, e. g., *Lemon, supra*, 403 U.S. at 619–22, 91 S.Ct. 2105; *Meek, supra*, 421 U.S. at 370–71, 95 S.Ct. 1753. The activities subsidized under the Statute here at issue, however, do not pose any substantial risk of such entanglement.[8]

---

8. We do not believe that the State must review every examination paper whose mark might have been influenced by the religious values or beliefs of the grader in order to be "certain" that the subsidized teacher's time is not used to inculcate religion. See *Lemon, supra*, 403 U.S.

at 609, 91 S.Ct. 2105. Whether the procedures employed by the State to prevent improper use of its aid achieve the requisite degree of certainty must be determined in light of the subsidized activity's potential for use as a vehicle for religious indoctrination. *Lemon* involved sub-

The services for which the private schools would be reimbursed are discrete and clearly identifiable. A teacher's taking of attendance, administration of examinations, and recordkeeping can hardly be confused with his or her other activities. Although there might be a possibility of fraud or mistake in the records submitted by private schools of the teachers' time spent on such activities, the careful auditing procedures anticipated by § 7 of the Statute should provide an adequate safeguard against inflated claims. In addition, since the services subsidized under the Statute are highly routinized, costs of the services for a given size of class should vary little from school to school, thus enabling the State to check claims filed by private schools against records maintained by hundreds of public schools under State supervision.[9]

For the foregoing reasons we conclude that Chapter 507, as amended, does not violate the Establishment Clause.

Settle judgment on notice.

ROBERT J. WARD, District Judge (dissenting).

When the constitutionality of Chapter 507, as amended by Chapter 508, of the 1974 Laws of New York ("Chapter 507" or "the statute") was previously raised before this three-judge Court, we held that the statute violated the Establishment Clause because it had a primary effect[1] of advancing religion. *Committee for Public Education v. Levitt*, 414 F.Supp. 1174 (S.D.N.Y.1976) ("*Levitt II*"). Our decision was based in large measure on the Supreme Court's holding in *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 1763, 44 L.Ed.2d 217 (1975). In *Meek*, the Court invalidated a Pennsylvania statute's $12 million authorization for the loan of secular, nonideological, and neutral instructional materials to that state's predominantly church-related nonpublic schools. The Court reasoned:

> To be sure, the material and equipment that are the subjects of the loan—maps, charts, and laboratory equipment, for example—are "self-polic[ing]", in that starting as secular, nonideological and neutral, they will not change in use." 374 F.Supp., at 660. But faced with the substantial amounts of direct support authorized by Act 195, it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many

---

sidies for personnel expenses attributable to the teaching process as a whole (for certain classes), an activity which presents a continuous and comprehensive potential for religious indoctrination, since the omniscient influence of the teacher, particularly in lower schools, is the paramount factor determining the character of classroom instruction. See *Lemon, supra*, 403 U.S. at 618, 91 S.Ct. 2105.

In contrast, the opportunity for religious indoctrination in the grading of end-of-course regents examinations is virtually nil. As we have noted, these examinations, given but once a year in any one class, require the grader to exercise subjective judgment only in connection with one, or possibly two, questions out of scores. These questions are prepared by the State, which provides instructions to guide the grading of essay questions. Clearly, the potential for advancing religion associated with the subsidized activities in this case is vastly inferior to that which the Court faced in *Lemon*.

9. The possibility that the process of appropriating funds to implement amended Chapter 507 might divide the State legislature along religious lines, which has not been suggested by the parties, does not pose a factor of sufficient consequence to warrant invalidation of the sub-

sidization as constitutionally impermissible. See *Meek, supra*, 421 U.S. at 365, n.15, 195 S.Ct. 1753. Indeed, in *Wolman* the Court upheld several provisions of the Ohio statute, involving annual expenditures of millions of dollars, without any reference to the potential for such discord in annual legislative consideration of expenditure bills.

1. It is well-settled that "[i]n order to pass muster [under the Establishment Clause], a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive government entanglement with religion." *Wolman v. Walter*, 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977); *accord Roemer v. Maryland Public Works Board*, 426 U.S. 736, 748, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger*, 421 U.S. 349, 358, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 772–73, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

of Pennsylvania's church-related elementary and secondary schools and to then characterize Act 195 as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, "when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission," state aid has the impermissible primary effect of advancing religion. *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 37 L.Ed.2d 923.

The church-related elementary and secondary schools that are the primary beneficiaries of Act 195's instructional material and equipment loans typify such religion-pervasive institutions. The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon v. Kurtzman*, 403 U.S., at 616–617, 91 S.Ct. 2105. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. "[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined." *Id.*, at 657, 91 S.Ct. 2105 (opinion of Brennan, J.). See generally Freund, Public Aid to Parochial Schools, 82 Harv.L.Rev. 1680, 1688–1689. For this reason, Act 195's direct aid to Pennsylva-

nia's predominantly church-related, non-public elementary and secondary schools, even though ostensibly limited to wholly neutral, secular instructional material and equipment, inescapably results in the direct and substantial advancement of religious activity, cf. *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S., at 781–783, and n.39, 93 S.Ct. 2955, and thus constitutes an impermissible establishment of religion.

421 U.S. at 365–66, 95 S.Ct. at 1763 (footnote omitted).

Reading *Meek* to state that the provision of substantial amounts of direct aid to the educational function of sectarian elementary and secondary schools impermissibly advanced religion by aiding the sectarian school enterprise as a whole, we struck down Chapter 507's programs reimbursing New York sectarian schools [2] for the costs—primarily teacher salaries and fringe benefits [3]—incurred in complying with state-mandated testing and pupil attendance reporting. Eighty-five percent of the 1,954 nonpublic institutions eligible to receive reimbursement under the statute were religiously-affiliated elementary and secondary schools. The purpose of many of those schools was to provide an integrated secular and religious education, and their teaching process was largely devoted to instilling religious values and belief.[4] See, *Meek, supra*, 421 U.S. at 356, 364, 366, 95 S.Ct. 1753; *Lemon v. Kurtzman*, 403 U.S. 602, 616–17, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). As in *Meek*, the amount of aid, estimated at $8–

---

2. In view of its clear severability clause, we upheld the statute to the extent that it authorized funds to nonsectarian private schools. *Levitt II, supra*, 414 F.Supp. at 1180 & n.9.

3. The reimbursement was not for salary supplements given teachers to compensate for the time devoted to funded activities, but rather represented a percentage of ordinary compensation which would have been paid even if the state-required services were not performed. *Levitt II, supra*, 414 F.Supp. at 1176.

4. According to defendants' answers to plaintiffs' interrogatories filed prior to our decision in *Levitt II*, the recipients of the aid included schools which: "(1) are controlled by churches or religious organizations, (2) have as their

purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at or participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, and/or (10) impose religious restrictions on what the faculty may teach." *Compare Meek, supra*, 421 U.S. at 356, 95 S.Ct. 1753.

$10 million annually, was substantial[5] and the form of the aid—payments to the schools themselves, subsidizing their operating costs—was direct. Accordingly, even though Chapter 507 was intended to aid only the secular educational function of the schools,[6] we held that the statute inevitably resulted in the direct and substantial advancement of religious activity.

My colleagues do not contend that we misconstrued or misapplied *Meek*'s standard in our opinion in *Levitt II*. It is rather their position that in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), the Court *sub silentio* rejected the principles set forth in *Meek* two years earlier,[7] and adopted a new standard under which substantial direct aid to the educational function of sectarian schools is permissible, so long as there is no substantial risk that the aid will be used for religious purposes. I see in *Wolman* no such retreat from *Meek* or reformulation of the applicable principles. I believe that *Meek* remains valid and that Chapter 507 cannot pass constitutional muster thereunder. Accordingly, I respectfully dissent.

That the testing and scoring provision in *Wolman*[8] was upheld does not, in my opinion, indicate that the Court has rejected *Meek*'s standard as to the permissibility of aid to the educational function of sectarian schools. *Meek* did not hold that all such aid was *ipso facto* unconstitutional, but only that substantial direct aid was. 421 U.S. at 359, 364–66, 95 S.Ct. 1753. In upholding *Wolman*'s provision, the Court expressly noted that the Ohio statute did not authorize any payment to nonpublic school personnel for the costs of administering the tests. 433 U.S. at 239, 97 S.Ct. 2593. Thus, it could not be claimed that the schools received direct aid in the form of such payments. Moreover, the Court reasoned, since nonpublic school personnel did not participate in either the drafting or the scoring of the tests, "[t]he nonpublic school [did] not control the content of the test or its result. This serve[d] to prevent the use of the test as a part of religious teaching, and thus avoid[ed] that kind of direct aid to religion found present in *Levitt* [*v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973)]."[9] 433 U.S. at 239–40, 97 S.Ct. at 2601. Because the Ohio statute, in contrast to Chapter 507, did not involve direct aid to sectarian schools, I see no inconsistency between *Meek* and the result in *Wolman*.

Nor do I believe that there is anything in *Wolman* which stands for the proposition that substantial direct aid to the religious

---

5. Compare the $12 million for the loan of instructional materials and equipment involved in *Meek*, where more than 75% of the 1,320 schools were religiously affiliated. 421 U.S. at 364–65, 95 S.Ct. 1753.

6. The legislative purpose of the statute was "to evaluate, through a system of uniform state testing and reporting procedures, the quality and effectiveness of instruction to assure that those who are attending instruction, as required by law, are being adequately educated within their individual capabilities." 1974 N.Y. Laws ch. 507, § 1.

7. Those principles were reaffirmed by the Court in *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 753–55, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

8. The Ohio statute under review in *Wolman* authorized the state "[t]o supply for use by pupils attending nonpublic schools within the district such standardized tests and scoring services as are in use in the public schools of

the state." 433 U.S. at 238–39, 97 S.Ct. at 2600.

9. In *Levitt v. Committee for Public Education*, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) ("*Levitt I*"), the Court invalidated the predecessor statute to Chapter 507, which had provided for reimbursement to sectarian schools of the expenses of teacher-prepared testing as well as standardized examinations and recordkeeping. While the Court's decision focused on the fact that no means were available to assure that the internally-prepared tests were free of religious instruction, *id.* at 480, 93 S.Ct. 2814, the Court in *Wolman* made it clear that *Levitt I* did not imply that reimbursement to religious schools for the costs of testing would be constitutionally permissible if teacher-prepared examinations were eliminated. "The Court did not reach any issue regarding the standardized testing, for it found its funding inseparable from the unconstitutional funding of teacher-prepared testing." 433 U.S. at 240 n.8, 97 S.Ct. at 2601.

schools' educational function which has some potential for religious use is now constitutionally permissible so long as the possibility is not substantial. In addition to the testing and scoring services, the only provisions upheld in *Wolman* which included aid to the schools' educational function [10] were the programs for therapeutic, guidance, and remedial services provided directly to students by public employees at public facilities,[11] *id.* at 248, 97 S.Ct. 2593, and for the loan of textbooks to students, *id.* at 238, 97 S.Ct. 2593. So far as I can discern, there is nothing in Justice Blackmun's opinion which indicates that either the testing and scoring or the therapeutic services were seen as presenting any potential whatsoever for diversion to religious use. Nor is there any suggestion that the aid would have been acceptable had any such possibility existed. Indeed, in order to uphold the loan of textbooks, the Court was forced to rely on the "unique presumption" of the non-divertibility of such aid created in *Board of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). 433 U.S. at 251–52 n.18, 97 S.Ct. 2593. Furthermore, the Court struck down the provision for the loan of instructional materials and equipment which were "incapable of diversion to religious use." *Id.* at 248–51, 97 S.Ct. at 2605.

Moreover, the Court clearly reaffirmed *Meek* in *Wolman* when it invalidated the programs providing field trip transportation and services to nonpublic school students and the loan of instructional materi-

als and equipment to pupils or their parents. In holding that the field trip provision had the impermissible effect of advancing religion, the Court, relying on *Meek*, reasoned that "the field trips are an integral part of the educational experience, and where the teacher works within and for a sectarian institution," impermissible direct aid is the inevitable result. *Id.* at 254, 97 S.Ct. at 2608. Furthermore, in striking down the loan of instructional materials and equipment, Justice Blackmun's opinion quoted *Meek* as follows:

> "The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon v. Kurtzman*, 403 U.S., at 616–617, 91 S.Ct. 2105. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence. Within the institution, the two are inextricably intertwined.' *Id.*, at 657, 91 S.Ct. 2105 (opinion of Brennan, J.)." 421 U.S., at 366, 95 S.Ct. 1753.

*Id.* at 249–50, 97 S.Ct. at 2606. The Court concluded, just as it had in *Meek*, that "[i]n view of the impossibility of separating the secular education function from the sectarian, the state aid inevitably flow[ed] in part in support of the religious role of the schools." *Id.* at 250, 97 S.Ct. at 2607.

---

10. The Court also upheld the provision of speech, hearing, and psychological diagnostic services to pupils attending nonpublic schools on the basis that they were public health services which could constitutionally be supplied to nonpublic school children as part of a general legislative program made available to all students. 433 U.S. at 242–44, 97 S.Ct. 2593. The permissibility of including sectarian schools in programs providing "bus transportation, school lunches, and public health facilities—secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school" was explicitly reaffirmed in *Meek*. 421 U.S. at 364, 371 n.21, 95 S.Ct. at 1763; *accord, Lemon, supra*, 403 U.S. at 616–17, 91 S.Ct. 2105; *Everson v. Board of Education*, 330 U.S. 1, 14, 17–18, 67 S.Ct. 504,

91 L.Ed. 711 (1947). The Court indicated that the Pennsylvania statute's provision of diagnostic speech and hearing services would have been permissible as such a general welfare service. 421 U.S. at 371 n.21, 95 S.Ct. 1763. The program was invalidated, however, because it was found to be unseverable from the unconstitutional provisions of the statute. *Id.*; *accord, Wolman, supra*, 433 U.S. at 243–44, 97 S.Ct. 2593.

11. As with the testing and scoring services, no direct aid was involved. No payments were provided to the schools, nor did the schools exercise control over the services. 433 U.S. at 244–48, 97 S.Ct. 2593.

Given this reaffirmation of *Meek*, it seems clear to me that the constitutional standard set forth in that opinion is still controlling. I believe that Chapter 507 does not satisfy that standard. The statute is intended to compensate for secular educational services, but the funds granted thereunder flow directly to schools dedicated to a religious mission. Therefore, the state aid "inescapably results in the direct and substantial advancement of religious activity." *Meek, supra,* 421 U.S. at 366, 95 S.Ct. at 1764.

In my opinion, the funds provided for recordkeeping under Chapter 507 have the impermissible effect of advancing religion for still another reason. Pupil attendance reporting is as essential to the schools' sectarian educational function as it is to the secular aspect of the curriculum. Yet, as was the case with the payments to nonpublic schools for nonideological maintenance and repair services involved in *Committee for Public Education v. Nyquist,* 413 U.S. 756, 774–80, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), no attempt has been made to restrict payments to those expenditures which are related exclusively to the schools' secular functions. Nor is such a restriction possible. Consequently, as in *Nyquist,* the state aid impermissibly advances religion by directly subsidizing the religious activities of sectarian schools. *Cf. Levitt v. Committee for Public Education,* 413 U.S. 472, 480, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) ("*Levitt I*").

Chapter 507 has the further constitutional defect, in my view, of requiring excessive governmental entanglement with religion. My colleagues have recognized that some of the testing materials could be diverted to religious use and that the records submitted in support of claims for reimbursement could be inaccurate. Once these possibilities for diversion have been detected, it seems to me that excessive state entanglement with religion is inevitable in order to avoid the impermissible effect of advancing religion:

We need not and do not assume that teachers in parochial schools will be guilty of bad faith or any conscious design to evade the limitations imposed by the statute and the First Amendment. . . .

. . . . But the potential for impermissible fostering of religion is present. . . . The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion . . . .

A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. . . .

*Lemon, supra,* 403 U.S. at 618–19, 91 S.Ct. at 2114; *accord, Wolman, supra,* 433 U.S. at 254, 97 S.Ct. 2593; *Meek, supra,* 421 U.S. at 369–70, 95 S.Ct. 1753.

In order to be *certain* that teachers whose salaries are subsidized by Chapter 507 do not use the testing materials for religious purposes, I believe that the state's current procedure of reviewing a random sample of examination papers for academic content would have to be supplemented by a detailed search for religious values or belief in the grading of all test papers in which the teacher exercises subjective judgment. For "[u]nlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment." *Lemon, supra,* 403 U.S. at 619, 91 S.Ct. at 2114; *accord, Wolman, supra,* 433 U.S. at 254, 97 S.Ct. 2593; *see Levitt I, supra,* 413 U.S. at 481, 93 S.Ct. 2814. Such a system of continuous monitoring of the grading of examinations by religious school teachers would constitute excessive entanglement between church and state. *See Wolman, supra* 433 U.S. at 254, 97 S.Ct. 2593; *Meek, supra,* 421 U.S. at 369–72, 95 S.Ct. 1753; *Lemon, supra,* 403 U.S. at 617–19, 91 S.Ct. 2105.

In addition, most of the state aid under Chapter 507 is for reimbursement of the cost of teacher salaries and fringe benefits. Such reimbursable costs are based upon the number of hours teachers devote to the funded activities. The schools are required

to submit a form entitled "Justification of Salary and Fringe Benefit Costs Claimed For State Aid For Testing, Reporting and Evaluating" on which the reimbursable costs are calculated by first computing the percentage of aggregate total work time devoted to funded services and then multiplying the amount of aggregate wages and benefits by that percentage. While this form and the additional reporting and auditing procedures [12] suffice to ensure the mathematical accuracy of the computations, they do nothing to verify that the percentage of total time claimed for reimbursable activities is based upon the number of hours teachers have actually devoted to purely

12. Chapter 507 provides in this regard:

§ 4. Application.

Each school which seeks an apportionment pursuant to this act shall submit to the commissioner an application therefor, together with such additional reports and documents as the commissioner may require, at such times, in such form and containing such information as the commissioner may prescribe by regulation in order to carry out the purposes of this act.

§ 5. Maintenance of records.

Each school which seeks an apportionment pursuant to this act shall maintain a separate account or system of accounts for the expenses incurred in rendering the services required by the state to be performed in connection with the reporting, testing and evaluation program enumerated in section three of this act. Such records and accounts shall contain such information and be maintained in accordance with regulations issued by the commissioner, but for expenditures made in the school year nineteen hundred seventy-three–seventy-four, the application for reimbursement made in nineteen hundred seventy-four pursuant to section four of this act shall be supported by such reports and documents as the commissioner shall require. In promulgating such record and account regulations and in requiring supportive documents with respect to expenditures incurred in the school year nineteen hundred seventy-three–seventy-four, the commissioner shall facilitate the audit procedures described in section seven of this act. The records and accounts for each school year shall be preserved at the school until the completion of such audit procedures.

§ 6. Payment.

No payment to a qualifying school shall be made until the commissioner has approved the application submitted pursuant to section four of this act.

§ 7. Audit.

No application for financial assistance under this act shall be approved except upon audit of vouchers or other documents by the commissioner as are necessary to insure that such payment is lawful and proper.

The state department of audit and control shall from time to time examine any and all necessary accounts and records of a qualifying school to which an apportionment has been made pursuant to this act for the purpose of determining the cost to such school of rendering the services referred to in section three of this act. If after such audit it is determined that any qualifying school has received funds in excess of the actual cost of providing the services enumerated in section three of this act, such school shall immediately reimburse the state in such excess amount.

In addition section 176.2 of the Regulations of the Commissioner of Education provides:

Application for apportionment and required accounting records.

(a) A nonpublic school requesting apportionment of State monies in connection with Chapter 507 of the Laws of 1974 shall submit an application to the State Education Department in the form and at such time as the Commissioner of Education shall require. In addition such nonpublic school shall submit completed apportionment worksheets as required by the Commissioner of Education.

(b) Each nonpublic school making application for apportionment during the school year 1975–76 and thereafter shall maintain at least the following records in support of the claim for apportionment:

(1) A separate set of expenditure accounts for each required service showing the amounts which are claimed for apportionment. These shall include accounts for salaries, supplies and materials, contractual expenses and fringe benefits.

(2) A time record for each employee involved in providing services for which apportionment is requested. This record shall clearly indicate the amount of time devoted to each service.

(3) An individual salary record for each employee involved in providing services for which apportionment is requested. This record shall show gross salary, payroll deductions and net salary by payroll period. Payroll summary records yielding the same information may be maintained in lieu of individual salary records.

(4) A voucher file which shall include all paid vouchers, in whole or in part, used to substantiate costs included in the claim for apportionment.

secular functions.[13] Indeed, in order to be certain, as the Establishment Clause demands, that none of the schools' religious functions have been served during the time charged, constant on-site inspection of sectarian schools would be required. Such a system of continuous state surveillance of the activities of religious schools would clearly constitute excessive state entanglement with religion. *See Lemon, supra,* 403 U.S. at 617–19, 621–22, 91 S.Ct. 2105.

Moreover, in my opinion, the instant statute has resulted in excessive entanglement of yet another sort. To determine the constitutionality under the Establishment Clause of the aid provided by Chapter 507, my colleagues have examined for possible religious meaning the sample tests and other documents submitted by the parties and have decided on the basis of this evidence that there was no substantial risk that the state aid could be used for religious purposes. The Supreme Court has stated, however, that the very adjudication required under such an approach is, in itself, excessive governmental entanglement with religion. In *New York v. Cathedral Academy,* 434 U.S. 125, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977), the Court held that New York State could not reimburse sectarian schools for the costs of state-mandated recordkeeping and testing services which were incurred in reliance on the predecessor statute to Chapter 507 before it was held unconstitutional in *Levitt I.* In response to the sectarian school plaintiff's argument that the Court of Claims would review all expenditures for which reimbursement was sought, in order to be certain that state funds did not subsidize sectarian activities, Justice Stewart, speaking for the majority, explained:

> [E]ven if such an audit were contemplated, we agree with the appellant that this sort of detailed inquiry into the subtle implications of in-class examinations and

other teaching activities would itself constitute a significant encroachment on the protections of the First and Fourteenth Amendments. In order to prove their claims for reimbursement, sectarian schools would be placed in the position of trying to disprove any religious content in various classroom materials. In order to fulfill its duty to resist any possibly unconstitutional payment, . . . the State as defendant would have to undertake a search for religious meaning in every classroom examination offered in support of a claim. And to decide the case, the Court . . . would be cast in the role of arbiter of the essentially religious dispute.

> The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment, and it cannot be dismissed by saying it will happen only once. Cf. *Presbyterian Church v. Blue Hull Mem. Presb. Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658.

434 U.S. at 132–33, 98 S.Ct. at 345.

In the instant case, it would appear that a one-time review such as that contemplated in *Cathedral Academy* would not suffice to ensure the neutrality of the aid provided by the New York statute. Chapter 507 authorizes reimbursement for teacher-time devoted not only to the reporting and examination programs currently in effect, but also to such "other similar state prepared examinations and reporting procedures" as may be developed in the future. 1974 N.Y. Laws ch. 507, § 3. Furthermore, even within the current testing programs, the examination questions presented to students and graded by state-subsidized teachers are constantly changing. While the majority may be satisfied that the risk of diversion to religious use presented by the sample exam-

---

**13.** I do not agree with my colleagues' suggestion that the accuracy of the time charged can be safeguarded by comparing the claims of private schools with those of public schools. To my knowledge, there is nothing in the record which indicates that any such comparison is included in the auditing procedures, *see* Foot-

note 12, *supra,* or which suggests that public schools even maintain comparable time records. In any event, I do not believe that comparisons by approximation are sufficient to satisfy the dictates of the Establishment Clause.

ination questions and materials they have reviewed to date is not substantial, I know of no way short of continuing surveillance to guarantee that the same is true of materials and examinations prepared in the future.

Accordingly, I conclude that Chapter 507 is unconstitutional under the Establishment Clause to the extent that it authorizes the allocation of state funds to sectarian schools,[14] both because it has a primary effect of advancing religion and because it fosters excessive governmental entanglement with religion.

---

14. Section 9 of the statute contains a severability clause in which the legislature expressed a clear intent that the act remain in force as to nonsectarian schools should its application as to sectarian schools be held to violate the Establishment Clause. *See* 1974 N.Y. Laws ch. 507, as amended by ch. 508, § 9. *Compare Sloan v. Lemon,* 413 U.S. 825, 833–34, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973). Accordingly my conclusion as to the unconstitutionality of the statute is limited to its application to sectarian schools.