Dr. Winfred L. Thompson, President University of Central Arkansas 201 Donaghey Avenue Conway, AR 72035-0001
Dear President Thompson:
You have requested an Attorney General opinion concerning the Governor's Distinguished Scholarship Program, which is codified at A.C.A. § 6-82-301et seq.
This program awards scholarships to Arkansas students who score 32 or above on the American College Test (ACT), 1410 or above on the Scholastic Aptitude Test (SAT), or who are selected as finalists in the National Merit Scholarship competition that is conducted by the National Merit Scholarship Corporation. A.C.A. § 6-82-302(9), -305(b). Recipients of the scholarship receive the payment of full tuition, room and board, and mandatory fees at the public or private institution of their choice within the state of Arkansas. (Some institutions outside the state of Arkansas may be chosen for certain specified fields of study.) A.C.A. §6-82-312, -302. The scholarship funds are distributed from the state directly to the chosen institution by electronic transfer. Governor's Scholars Program Rules and Regulations, Rule 5(I)(A). The funds are then disbursed "to the student according to the individual institution's disbursement procedures." Id. This provision is commonly interpreted to mean that the funds are applied to the student's account with the institution. Any excess funds are paid to the student. You indicate that nearly one-half of the monies awarded to date have been distributed to church-affiliated, private institutions in Arkansas. Under the rules and regulations governing the program, the institutions to whom monies are paid are required to make certain reports to the state regarding the receipt of the funds and the enrollment status of the scholarship recipient, but these institutions are not restricted in their uses of these funds, once received.
You have presented the following questions about this scholarship program:
 (1) Does the Governor's Distinguished Scholarship Program's requirement that church-affiliated, private institutions maintain administrative and accounting procedures for review by the state violate the Establishment Clause of the United States Constitution?
 (2) Does the Governor's Distinguished Scholarship Program's payment of financial aid directly to church-affiliated, private institutions violate the Establishment Clause of the United States Constitution? Does this procedure constitute a direct subsidy to church-affiliated, private institutions?
 (3) Does the disparity in the amount of state funds spent on public and church-affiliated, private institutions violate the Establishment Clause of the United States Constitution?
 (4) If the Governor's Distinguished Scholarship Program is found to create an incentive for students to attend church-affiliated, private institutions, does this fact violate the Establishment Clause of the United States Constitution?
 (5) Does the Governor's Distinguished Scholarship Program constitute a scheme to channel state funds directly to church-affiliated, private institutions?
 (6) If the Governor's Distinguished Scholarship Program is found to have a disparate impact upon race and gender because of its use of the ACT, SAT, and National Merit scores as the sole criterion for selection, does this fact violate Title VI of the Civil Rights Act?
RESPONSE
Because five of your questions implicate the Establishment Clause of the U.S. Constitution, I will begin by setting forth the general Establishment Clause principles that will play a role in my analysis of the issues you have raised.
The Establishment Clause of the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion[.]" U.S. Const., Am. 1.
In Lemon v. Kurtzman, 403 U.S. 602 (1971), the U.S. Supreme Court set forth a three-pronged test for determining whether the Establishment Clause has been violated. In order to avoid offending the Establishment Clause, the government action in question must: (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster an excessive entanglement with religion.Id. at 612-13.
In Agostini v. Felton, 521 U.S. 203 (1997), the Court held that the "effect" and "entanglement" prongs of the Lemon test actually comprise a single "effect" inquiry.
It is my opinion that the Governor's Distinguished Scholarship Program satisfies the first prong of the test. That is, the Program clearly has a secular purpose. The General Assembly stated the following underlying policies and purposes of the Program:
 The General Assembly recognizes that outstanding students are an essential ingredient for the economic and social benefit of the State of Arkansas. Benefits accrue to the state when a majority of National Merit scholars and superior students attend Arkansas institutions of higher learning and remain in the state.
A.C.A. § 6-82-301.
 A scholarship program to promote academic excellence and to encourage the state's most talented graduates to enroll in Arkansas postsecondary educational institutions is created and established, which shall be cited as the "Arkansas Governor's Scholars Program."[1]
A.C.A. § 6-82-303.
The foregoing legislative statements indicate without question that the purpose of the Governor's Distinguished Scholarship Program is secular.
Nevertheless, the U.S. Supreme Court has stated that "the propriety of a legislature's purposes" may not immunize the law from further scrutiny.See Committee for Pub. Educ. Religious Liberty v. Nyquist,413 U.S. 756, 774 (1973).
In deciding the effects prong of the test, I must note that a complete
"effects" inquiry requires that certain factual determinations be made. The Attorney General is not authorized to make factual determinations. For this reason, in evaluating the "effects" issues that you have raised, I will be limited to the legal aspect of those issues, and must leave the factual aspect unanswered. That is, I must limit my analysis to an evaluation of the "facial" constitutionality of the Governor's Distinguished Scholarship Program. Accordingly, my responses cannot be conclusive or definitive. Facial neutrality will not salvage a program under the "effects" test. Bowen v. Kendrick, 487 U.S. 589 (1988).
Nevertheless, I must point out that legislation is presumed to be constitutional, and until it is challenged and stricken down by a court, it remains viable. Ford v. Keith, 338 Ark. 487, S.W.2d (1999). Therefore, even if a constitutional dispute should arise concerning the Governor's Distinguished Scholarship Program, until the Program has been challenged and stricken down by a court, it continues to be enforceable.
Question 1 — Does the Governor's Distinguished Scholarship Program'srequirement that church-affiliated, private institutions maintainadministrative and accounting procedures for review by the state violatethe Establishment Clause of the United States Constitution?
It is my opinion that the requirement that private, church-affiliated institutions maintain administrative and accounting procedures for review by the state does not render the Governor's Distinguished Scholarship program unconstitutional on its face.
The danger of administrative and accounting requirements in a grant program is that such requirements can foster excessive entanglement between the state and religion. The Court has found excessive entanglement arising out of required administrative duties in situations where the required duties allowed discretion on the part of the non-public institution, thus permitting the duties to be used as a conduit of ideological views. For example, in Levitt v. Committee forPublic Educ., 413 U.S. 472 (1973), the Court considered the constitutionality of a program under which the state of New York reimbursed private schools for certain costs of testing and recordkeeping. The Court found that because some of the required tests were prepared and graded by nonpublic school teachers, they could be "drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church." Levitt, supra, at 480. The Court has also found excessive entanglement in programs that required inordinate state supervision or surveillance of the religious institution by the state. For example, in Lemon v. Kurtzman, 403 U.S. 602
(1971), the Court considered the constitutionality of certain Rhode Island program that provided for the purchase of various materials and teacher services from nonpublic schools, if certain per pupil expenditure limitations were met, and if ideological functions were kept separate from secular ones. The Court found that excessive entanglement arose out of the fact that the program required constant state supervision to assure that the statutory conditions were met. In addition, the program required continual surveillance by the state of the religious institutions' expenditure records (whether the expenditures were for religious or secular purposes), to assure compliance with expenditure limitations.
In contrast, the Court found no excessive entanglement arising out of the administrative requirements that were at issue in Committee for PublicEducation v. Regan, 444 U.S. 646 (1980). There, Court addressed the constitutionality of a New York reimbursement program that was enacted to replace the one that was struck down in Levitt, supra. The new program reimbursed nonpublic schools for the cost of complying with certain state-mandated requirements, including testing and reporting. Unlike the former program, the new program did not allow nonpublic school personnel to control the content of any tests. The Court found that there was therefore no substantial risk that the examinations could be used for religious educational purposes. Similarly, the Court found that the recordkeeping and reporting services were not part of the teaching process and therefore could not be used to foster an ideological outlook. The Court upheld the program. (It should be noted that another helpful factor in that case was the fact that the program at issue there provided other assurances that no state funds would be used to further religious teaching. See discussion of this issue in response to Question 3.)
The question of whether the administrative responsibilities that are imposed under the Governor's Distinguished Scholarship Program, as applied, involve ideological activities or inordinate state supervision or surveillance is inherently a question of fact that I am not authorized to determine. However, on the face of the statute creating these requirements, they do not appear to do so. Accordingly, I conclude that this aspect of the Program does not, on its face, violate the constitution.
Question 2 — Does the Governor's Distinguished Scholarship Program'spayment of financial aid directly to church-affiliated, privateinstitutions violate the Establishment Clause of the United StatesConstitution? Does this procedure constitute a direct subsidy tochurch-affiliated, private institutions?
It is my opinion that the Governor's Distinguished Scholarship Program's payment directly to church-affiliated, private institutions does not, on its face, render the program unconstitutional or constitute a direct subsidy to such institutions.
It appears from the cases that have been decided by the U.S. Supreme Court that direct payment is only an issue of concern in situations in which the institution itself, as opposed to individual students, applied for a grant from the state. See, e.g., Committee for Public Educ. v.Regan, 444 U.S. 646, 659 (1980); Levitt v. Committee for Public Educ.,413 U.S. 472, 489 (1973); Nyquist, supra at 775; Tilton v. Richardson,403 U.S. 672 (1971); Columbia Union College v. Clarke, 159 F.3d 151
(1998), cert. denied ___ U.S. ___ (1999, No. 98-1509). In those cases, the state determined whether the applicant institution was to receive the funds or not. The direct payment of money from the state became problematic if the state did not impose restrictions to assure that the money was not used for religious purposes.
The Court appears to view the situation differently when the student, rather than the institution, is the applicant for the funds, and the state plays no role in determining whether the religious institution is chosen to receive the funds. I draw this conclusion from certain language of the Court in Witters v. Wash. Dept. of Services for Blind,474 U.S. 481 (1986). Even though Witters did not involve direct payment to a religious institution, the Court's discussion of who chooses the institution made the issue clear. Witters involved a state program that paid funds to handicapped students to fund a vocational education. A blind student used his grant from the program to attend a religious school so that he could prepare for a career in the ministry. In discussing the issue, the Court noted that even though state funds ultimately went to a pervasively religious institution and funded a religious education, they did so "only as a result of the genuinely independent and private choices of aid recipients." Witters, 474 U.S. at 488. This statement by the Court made clear that the basis on which the religious institution is chosen to receive state funds is crucial to a determination of the constitutionality of the program. That is, it matters whether the state or the student chooses the institution. The Court's statement regarding this matter indicates that if the student chooses the institution and the state has no role in that choice, the route by which the funds reach the institution seems to be irrelevant.
Because the state has no role in choosing the institutions that receive state funds under the Governor's Distinguished Scholarship Fund, it is, in this limited sense, analogous to the program that was at issue inWitters.
Accordingly, I conclude that the fact that the Governor's Distinguished Scholarship Program transfers funds directly to the student's chosen institution does not render it unconstitutional. I must emphasize, however, that as discussed in response to Question 3, the Governor's Distinguished Scholarship Program is distinguishable in certain significant respects from the program in that was at issue in Witters.
More particularly, I note that the route by which state funds flow to the religious institution appears to be less important than the issue of whether the scholarship recipient's private choice of institutions is "genuinely independent." See discussion of this issue in response to Question 3.
Question 3 — Does the disparity in the amount of state funds spent onpublic and church-affiliated, private institutions violate theEstablishment Clause of the United States Constitution?
It is my opinion that any disparity in the amount of state funds spent by the Governor's Distinguished Scholarship Program on public and church-affiliated, private institutions is not a feature that appears on the face of the Program. For that reason, such a disparity must be factually established if the Program is to be challenged on this ground.[2]
The question of whether the Governor's Distinguished Scholarship Program creates a disparity in the amount of state funds spent on public and religious institutions is at the heart of any constitutional concern that might exist regarding the Program. Accordingly, I will discuss the applicable legal standards that have developed with regard to this issue in the cases that have been decided by the U.S. Supreme Court.
The case that is perhaps the most helpful in evaluating the Governor's Distinguished Scholarship Program is Witters v. Wash. Dept. of Servicesfor Blind, 474 U.S. 481 (1986), referenced previously in response to Question 2. As noted, the Supreme Court held in Witters that the Establishment Clause did not prohibit a blind student from using funds awarded to him under a state vocational assistance grant to pay for his religious education at a Christian college. The Court found that this grant was permissible because even though it ultimately went to a religious institution and funded a religious education, it did so "only as a result of the genuinely independent and private choices of aid recipients." Witters, 474 U.S. at 488. The Court likened the grant to a situation in which the state issues a paycheck to one of its employees, who in turn donates the entire amount to a church. The Court noted that the State may pay this employee without constitutional concerns, even knowing what the employee intends to do with the paycheck.
Concerning this feature of the program, the Court stated:
 Washington's program is "made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited," . . . and is in no way skewed towards religion. . . . It creates no financial incentive for students to undertake sectarian education. . . . It does not tend to provide greater or broader benefits for recipients who apply their aid to religious education[.]
Witters, Id. at 487, quoting Committee for Public Education and ReligiousLiberty v. Nyquist, 413 U.S. 657, 782-786, n. 38 (emphasis added).Accord, Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1 (1993) (upholding the use of state funds to provide a deaf student with an interpreter even though he attended a sectarian school, because the benefit was provided neutrally — i.e., it would have been the same regardless of which school the student had attended.).
Witters indicates that in order to alleviate constitutional concerns, a scholarship program must be structured so that:
 (1) If state scholarship funds flow to religious schools, they must do so solely as a result of the genuinely independent choice of the scholarship recipient;
(2) The program must not be skewed toward religion;
 (3) The program must not create a financial incentive for students to choose religious schools;
 (4) The program must not provide greater or broader benefits for recipients who apply their scholarship money to religious education.
As noted previously, the Governor's Distinguished Scholarship Program does not pay a set amount, but rather, pays full tuition and fees at the institution of the recipient's choice, without regard to amount. Any resulting disparity between amounts paid to public and private institutions may or may not impact the Program's constitutionality, depending on the factual evidence. As indicated, this issue can only be determined by a qualified finder of fact.
A court considering the Governor's Distinguished Scholarship Program could find, on the basis of Witters, that although the state funds that are paid under the Governor's Distinguished Scholarship Program do flow to religious institutions as a result of the private choices of the scholarship recipients, they do not do so as a result of the "genuinely independent" choices of the recipients (as they did in Witters). Because the Program does not pay the same amount regardless of the institution chosen, but rather, pays full tuition at the institution of the recipient's choice, a court could conclude that the Program entices students to choose more expensive, private religious schools, and that the Program is thereby "skewed toward religion," that it provides "greater and broader benefits" for recipients who choose religious schools than it does for those who choose state schools, and that it "creates [a] financial incentive" for recipients to choose religious schools. It is possible that this result would obtain if for no other reason than that the recipient perceives that by choosing the more expensive option, he or she will receive something of greater value. (I note that according to this reasoning, whether the recipient does, in fact, receive something of greater value by choosing a religious school would be irrelevant to the "incentive" inquiry.)
I express no opinion as to whether a court would so hold. Indeed, it is equally likely that a court could find that the Program is completely neutral on its face, given the fact that scholarship funds are distributed without reference to the religious leanings of the recipients and without regard to whether the recipient schools are religious or secular. On the basis of this facially-neutral feature of the Program, a court might conclude that the Program is not constitutionally problematic. That is, a court could find that the Program is specifically structured so that religion will play no role in the decision to award scholarships, and that any benefits that accrue to religion as a result of the Program occur only incidentally and not by the design of the Program.
I must reiterate at this juncture that the question of whether the Governor's Distinguished Scholarship Program is skewed toward religion, whether it does provide greater or broader benefits to recipients who choose religious schools, whether it does create a financial incentive for recipients to choose religious schools — or whether, in contrast, it is neutral in its distribution of funds — cannot be answered in the absence of substantial factual support. Again, the Attorney General has neither the authority nor the resources to engage in the type of factual inquiry that would be necessary to determine definitively whether the Governor's Distinguished Scholarship Program has any of these attributes. Only a court can undertake such an inquiry. I am therefore limited to pointing out the possible issues that might arise in the context of a consideration of this aspect of the Program.
It is my opinion that because a disparity of expenditures does not appear on the face of the Governor's Distinguished Scholarship Program, the Program cannot be said to be unconstitutional on its face, on this basis. However, I recognize that a genuine dispute could arise concerning the effect of making greater expenditures to private, religious institutions than to state institutions. Again, this issue will turn largely on the facts that can be established concerning the disparity in expenditures.
It should be noted that the feature of the Governor's Distinguished Scholarship Program that could give rise to a challenge on the grounds of the "disparity" issue is a feature of the Program that is easily corrected. For example, if the Program were revised so as to pay a flat amount regardless of the institution chosen by the scholarship recipient, there would be no grounds for the charge of disparity in amounts paid to public and private institutions.
Finally, I must reiterate and emphasize that legislation is presumed to be constitutional, and until it is challenged and stricken down by a court, it remains viable. Ford v. Keith, 338 Ark. 487, S.W.2d (1999). Therefore, until the Governor's Distinguished Scholarship Program has been challenged and stricken down by a court, it continues to be enforceable.
Question 4 — If the Governor's Distinguished Scholarship Program is foundto create an incentive for students to attend church-affiliated, privateinstitutions, does this fact violate the Establishment Clause of theUnited States Constitution?
It is my opinion that because the question of whether the Governor's Distinguished Scholarship Program creates financial incentive to choose religious schools is inherently a question of fact, it is an aspect of the Program which, if true, does not appear on the face of the Program. I therefore cannot make a conclusive constitutional judgment about the Program on the basis of this factor. Nevertheless, I note that if the creation of such an incentive were factually established, it could give rise to constitutional concerns. See response to Question 3 for a discussion of this issue.
Question 5 — Does the Governor's Distinguished Scholarship Programconstitute a scheme to channel state funds directly tochurch-affiliated, private institutions?
On its face, it does not. However, whether the Program's application constitutes such a "scheme" is purely a question of fact. As indicated previously, the Attorney General has neither the authority nor the resources to make determinations of fact. I recognize that the U.S. Supreme Court has eschewed what it has referred to as "the ingenious plans for channeling state aid to sectarian schools" that "periodically" have come before the Court. See, e.g., Witters, supra, at 488; Nyquist,supra, at 785. However, an adequate determination of whether a particular program constitutes such a scheme would require an in-depth consideration of voluminous testimony and other evidence concerning the history of the Governor's Scholarship Program and the intent of the individuals who created it and who supported its creation. Only a qualified finder of fact can consider and evaluate such evidence and draw legal conclusions therefrom.
Question 6 — If the Governor's Distinguished Scholarship Program is foundto have a disparate impact upon race and gender because of its use of theACT, SAT, and National Merit scores as the sole criterion for selection,does this fact violate Title VI of the Civil Rights Act?
It is my opinion that the Governor's Distinguished Scholarship Program is not governed by Title VI of the Civil Rights Act. 42 U.S.C. § 2000d. Title VI prohibits discrimination in "any program or activity receiving federal financial assistance." Id. The Governor's Distinguished Scholarship Program does not receive federal financial assistance. Rather, it is funded entirely by state appropriations. Therefore, if the argument is that the Program itself (as opposed to one of the recipient institutions) has a disparate impact upon race and gender, the remedy is not Title VI of the Civil Rights Act.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:SA/cyh
[1] The "distinguished" scholarship program that is the subject of this opinion is one of the programs included in the "Governor's Scholars' Program" established by A.C.A. § 6-82-303.
[2] I note that in cases where the benefit in question is offered neutrally, without regard to the religious or nonreligious nature of the institution, a consideration of statistics showing disparate results is inappropriate. See Mueller v. Allen, 463 U.S. 388 (1983). Because I note herein the possibility of a dispute concerning the neutrality of the program, it is my opinion that a statistical inquiry into possible disparate results may be appropriate.